Eldridge et ux. *v.* Melcher et al., Appellants.

Argued March 22, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, SPAULDING, CERCONE, and SPAETH, JJ.

*Richard P. McBride,* with him *James C. Bowen,* and *Power, Bowen & Valimont,* for appellants.

*Alan D. Williams, Jr.*, with him *R. Kirkland Mc-Quiddy, Roger N. Rosenberger,* and *Williams and Glantz,* for appellees.

OPINION BY HOFFMAN, J., December 11, 1973:

The instant appeal from a denial of post-trial motions involves some unusual legal issues and tragic consequences of an automobile accident.

On August 1, 1963, at approximately 2:30 p.m., the wife-appellee, Delta N. Eldridge, accompanied by her two youngest children, was traveling in a northerly direction along U. S. Route 611. As she rounded a curve in the two-lane roadway, a truck proceeding in a southerly direction collided with her vehicle. The collision caused the vehicles to spin around, overturning the truck, virtually demolishing the automobile, and leaving both vehicles off their respective sides of the road. The two children, who were passengers in appellee's car, were thrown from the car and sustained fatal injuries. The wife-appellee suffered compound fractures in several portions of her body. As a further result of the accident, she suffered retrograde amnesia, and underwent protracted psychiatric and psychological treatment.

Wife-appellee and her husband instituted suit against the driver and owner of the truck on September 2, 1964.[1] At a deposition, taken in January of 1965, involving the same factual situation but in a separate action, the wife-appellee testified that her memory was a "blank". At a pre-trial conference before the Honorable Lawrence A. MONROE, on December 18, 1969, plaintiff's counsel stated that his client (who was not present at this conference) could not remember the facts

---

[1] Husband and wife-appellee are now divorced, with Delta N. Eldridge as the only remaining appellee of interest. Furthermore, the driver of the truck is dead. The owner, Elmer O. Strouse, is the only living appellant.

surrounding the accident. Undoubtedly basing a portion of his Pre-Trial Order on this oral statement by counsel, the trial judge stated that "the Plaintiff . . . no longer recalls circumstances of accident."

At time of trial, the only direct testimony concerning its occurrence was provided by the wife-appellee. There were no eyewitnesses to the accident. Mrs. Eldridge testified that it was raining and the roadway was wet. She stated that her visibility was unimpaired. She said that as she rounded the curve, staying on her side of the road, a truck, traveling at a speed of about 35 miles per hour, crossed over to the wrong side of the road and struck her car. On cross-examination, defense counsel asked the wife-appellee when it was that she began to remember. The colloquy was as follows: "Q. When did you tell your attorney that you started to remember things? A. Around '68. Q. It was 1968 that you told your attorney that you started to remember things; is that correct? A. Yes."

Defense counsel offered the testimony of Dr. Joseph Robinson, a physician specializing in psychiatry and neurology, who had examined the wife-appellee four days prior to trial. He stated that in his medical opinion a person suffering from retrograde amnesia would regain her memory within 30 days or not at all. In his examination of the wife-appellee, Dr. Robinson evoked a statement by Mrs. Eldridge that her mind was a "blank" with respect to the accident in question. He stated: "I asked her if she recalled the accident actually happening. She said she did not remember the accident happening, and that her last memory was that she was talking to her children minutes prior to the accident, and her next memory is that she woke up at the Abington Hospital." When asked how it was that plaintiff could recall at trial the accident when four days prior thereto she could not remember those circumstances, Dr. Robinson replied: "Well, it is not actual recall.

What it is, is a matter of piecing together bits of information about the accident that come from a variety of sources . . . to create a story, especially if such a story helps her to absolve her own self or her own feeling of guilt."

In rebuttal, plaintiff's attorney called Dr. Albert M. Honig, a psychiatrist, who testified that amnesia suffered as a result of the kind of trauma which the plaintiff experienced could dissipate over a period of time. He further stated that there was no way to pinpoint a time period for recall, but that it could come at any time, and as a result of a number of emotional and psychological factors, including "domestic split-up" (as occurred between the parties, allegedly as a result of the death of the two children) or "expectancy of litigation" with regard to this accident.

At the conclusion of the defendants' case, defense counsel made the following request: "MR. BOWEN: I would like to offer into evidence, if the Court please, by a statement by the Court to the effect that the pre-trial order of December 1969 reveals that the plaintiff did not have a recollection as to the circumstances of the accident."

The trial judge, who was also the pre-trial conference judge, denied the offer of proof. On November 12, 1970, the jury returned a verdict in favor of the plaintiff in the amount of $150,000 against both defendants. Motions for judgment n.o.v. and for a new trial were denied. This appeal has followed.

### Scope of Review in Appeals From Denial of Motions For Judgment N.O.V. and For a New Trial

As a reviewing court, we face two separate and distinct questions when deciding the propriety of a lower court's ruling denying motions for judgment n.o.v. and for a new trial. A judgment n.o.v. is the directing

of a verdict in favor of the losing party, despite a verdict to the contrary. It may only be entered in a clear case where the evidence is insufficient to sustain a verdict against him. *Stewart v. Chernicky*, 439 Pa. 43, 266 A. 2d 259 (1970). Judgment n.o.v. is inappropriate if the evidence on a material point presented an issue of fact for decision by the jury. This method of attacking the verdict may never be utilized so as to invade the province of the jury, especially where that determination is based partly on questions of conflicting testimony and credibility of witnesses. *Brandon v. Peoples Natural Gas Co.*, 417 Pa. 128, 207 A. 2d 843 (1965) ; *Axilbund v. McAllister*, 407 Pa. 46, 180 A. 2d 244 (1962). Where such questions were determined by the trier of fact, and if there is reasonable support for the verdict which was rendered, a judgment n.o.v. will not be granted, as the weight of the evidence is a jury matter and may only be raised by a motion for a new trial if the verdict is contrary to the weight of the evidence. As to whether there is reasonable support in the evidence for the verdict, it should be noted that the evidence may be found sufficient, though it be meager or uncorroborated. *Farmers' Northern Market Co. v. Gallagher*, 392 Pa. 221, 139 A. 2d 908 (1958).

In the instant case, the wife-appellee was the only eyewitness to the accident. The credibility of her testimony was crucial to a determination of liability. It was this testimony, as emerging from a traumatically-caused amnesiac, that was attacked by the introduction of expert testimony of psychiatrists on her ability to recall the facts of the accident. At no time was the content of Mrs. Eldridge's testimony disputed or rebutted, but merely her ability to observe, recall and reconstruct the scene. Furthermore, based upon the physical evidence and the testimony of witnesses who came upon the scene following the accident, material issues going to the question of circumstantial evidence of negligence

were properly submitted to the jury, and could, we believe, be resolved in favor of the plaintiffs.

It must be remembered that it is not this Court's function to substitute our judgment or evaluation of evidence where there is some credible evidence upon which to base the jury's verdict. As our Supreme Court said in *Smith v. Bell Telephone Co. of Pennsylvania,* 397 Pa. 134, 138-139, 153 A. 2d 477, 479-480 (1959): "[T]he evidence presented must be such that by reasoning from it, without resort to prejudice or guess, a jury can reach the conclusion sought by plaintiff, and not that that conclusion must be the *only* one which logically can be reached. . . . The facts are for the jury in any case whether based upon direct or circumstantial evidence where a reasonable conclusion can be arrived at which would place liability on the defendant. It is the duty of plaintiff to produce substantial evidence which, if believed, warrants the verdict he seeks. The right of a litigant to have the jury pass upon the facts is not to be foreclosed just because the judge believes that a reasonable man might properly find either way." See also, *Handfinger et al. v. Phila. Gas Works,* 439 Pa. 130, 266 A. 2d 769 (1970) (judgment n.o.v. reversed and verdict reinstated because credibility questions and circumstantial evidence could have been reasonably resolved in favor of the plaintiffs).

The granting of a new trial has traditionally been within the inherent power of the trial court. Such a motion is addressed to the discretion of the trial court based upon the circumstances of the particular case, and the court's refusal will not be reviewed in the absence of a manifest abuse of discretion or a clear error of law. *Nicholson v. Garris,* 418 Pa. 146, 210 A. 2d 164 (1965) ; *Feldman v. Starin,* 203 Pa. Superior Ct. 130, 199 A. 2d 482 (1964). Numerous grounds for the granting of a new trial have been recognized. Applicable to the instant appeal, and well-established as

reasons therefor, are erroneous exclusion of evidence, where the error is material and prejudicial, *Panik v. Didra,* 370 Pa. 488, 88 A. 2d 730 (1952) ; and, where an issue is improperly submitted to the jury or an erroneous instruction to a jury is made, *Pavorsky v. Engels,* 410 Pa. 100, 188 A. 2d 731 (1963) ; *Weinstein v. Phila. Transportation Co.,* 222 Pa. Superior Ct. 448, 295 A. 2d 111 (1972) ; *Constructors' Association of Western Pa. v. Furman,* 170 Pa. Superior Ct. 554, 87 A. 2d 801 (1952).

### Exclusion of Evidence Adduced at the Pre-Trial Conference

At the close of defendants' case, defense counsel sought to introduce evidence of a statement made by plaintiff's counsel at a pre-trial conference held in 1969, at which he stated that his client at that time could not recall the circumstances of the accident. This statement, which was not incorporated in any sworn affidavit or pre-trial memorandum, was obliquely referred to in the Court's Pre-Trial Order which recognized the possibility of a presumption of due care that might attach to a plaintiff who "no longer recalls circumstances of accident." The offer of proof made by counsel at trial came in the form of a request that the trial judge state to the jury that he was present at said conference and remembered such a statement to have been made by plaintiff's attorney. This was denied.

The purpose of evidence that would establish a state of mind in 1969 could only go to the credibility of the plaintiff who at time of trial recalled the accident and stated that she began remembering "things" in 1968. This testimony was in contradiction to the statement made by trial counsel, and could have served as impeaching evidence. This out-of-court statement was made in a context which merits close scrutiny and examination.

It has long been recognized that the acts and declarations of an agent may bind the principal when made in the course of employment. So too, the client may be bound by the acts or statements of his attorney, when made within the scope of his authority. *McGarity v. New York Life Ins. Co.*, 359 Pa. 308, 59 A. 2d 47 (1948). While distinct and formal admissions made by an attorney during the course of a trial when made for the purpose of dispensing with formal proof are binding upon a client, it is generally held that an attorney, "merely by reason of his employment in connection with litigation, pending or prospective, has no power to affect his client by admissions of fact made out of court, and not given for the specific purpose of dispensing with proof of the facts admitted." 7 Am. Jur. 2d, Attorneys at Law, §122, pp. 121-122; in accord, *Mahler v. Singer*, 285 Pa. 540, 132 A. 718 (1926). The rule has been expressed as barring the introduction of evidence of admissions made out of court and not in the presence of the client, unless authority to make them or knowledge or assent of the client thereto is affirmatively shown. *Malone v. Marano*, 326 Pa. 316, 320, 192 A. 254 (1937) ; *Douglass v. Mitchell*, 35 Pa. 440, 447 (1860).

We have reviewed the case law in this Commonwealth, and find that not a single case has held evidence of the type and character as in the instant case to be admissible by the attorney's acts or statements. In two Pennsylvania Supreme Court cases, under different and distinguishable circumstances, the Court upheld the admission of attorney's statements made on behalf of the client. *Fessman Estate*, 386 Pa. 447, 126 A. 2d 676 (1956) ; *McGarity v. New York Life Ins. Co.*, supra. In both cases, the client, for whom the statement was allegedly made, was dead and therefore unavailable at time of trial to either corroborate or refute the truth of the statement or the authority of the attorney to make same. In *Fessman*, prior to decedent's

demise, the decedent and his wife had been negotiating a support and property agreement. After the husband's death, wife sued the decedent's estate for alleged enforcement of a contract to support the minor child. In order to prove the existence of said "contract", wife was permitted to admit the statement of decedent's attorney who had stated in the form of a letter, during husband's lifetime, that the client had every intention of supporting his child in a reasonable fashion. The Court concluded that considering the subject-matter, the objectives of the parties, and the circumstances of decedent's untimely death, the *"admissions* by Fessman's attorney are admissible in evidence with the same force and effect as if they had been made directly by Fessman himself." *Fessman* at 452. In *McGarity,* executors brought an action against a life insurance company for a claim that the estate was entitled to recover the accidental death benefits under the policy. The insurance company was held to be permitted to introduce a letter written by decedent's attorney to a third person (decedent had crashed his car into the house of one Mrs. Clasby, who sued the estate for damages) wherein the estate denied liability because decedent had been rendered unconscious from a heart seizure at the wheel of his automobile, and that the resultant accident was unavoidable. As such evidence was directly pertinent to the question of the insurance company's liability to the decedent, this statement was permitted.

In the instant case, the statement was made in a conference wherein negotiation and trial strategy are the keynotes of the meeting. Plaintiff was not present at said conference. This statement, which served neither to act as an admission of liability or duty nor to dispense with any proof at time of trial, and which was made orally and not in the presence of the client, cannot be analogized to the circumstances existing in either *McGarity* or *Fessman*. The statement purports only to

express an "assumed fact" as to the plaintiff's state of mind. The possibility that such a statement could be made as a result of inconclusive and sketchy communications with the client, based partially on truth and partially on a failure to fully question or test the client's memory, is reason enough for excluding evidence which at most constituted an assumption on the state of the plaintiff's memory, at a time when as plaintiff testified at time of trial she "began recalling things."

We are also confronted with the unusual nature of defense counsel's offer of proof. Because the oral statement made by plaintiff's attorney was neither transcribed nor incorporated in plaintiff's pre-trial memorandum, defense counsel sought a statement by the trial judge informing the jury of the Pre-Trial Order and the circumstances of the conference. The trial judge refused this offer, as he admitted that the Order was based upon an "assumed fact"; did not state unequivocally for the purpose of dispensing with proof or binding the parties that plaintiff did not recall the accident, but instead appeared as a possible question of law on the presumption of due care if such circumstances were present at time of trial; and, finally, because the revelation of such "evidence" to a jury would have necessitated his own clarification and explanation of a conference taking place 11 months prior to trial and on "collateral matters". We agree with the trial court's ruling.

It is the trial court's function to exclude evidence that would confuse issues and distract the attention of the jury "from the primary to collateral issues." *Geesey v. Albee Pennsylvania Homes, Inc.*, 211 Pa. Superior Ct. 215, 223, 235 A. 2d 176 (1967). Furthermore, the exclusion of evidence may not be grounds for a new trial where said evidence would not have affected the verdict or where other evidence of the same fact was introduced by the party applying for the new trial.

*Rankin v. Boyle,* 328 Pa. 284, 195 A. 36 (1937); *Rudella v. Lofland,* 213 Pa. Superior Ct. 305, 247 A. 2d 792 (1968).

In the instant case, Dr. Robinson, who was a defense expert witness, testified that four days prior to trial, plaintiff had told him at a psychiatric examination that she remembered nothing concerning the accident. He also stated that her form of amnesia would have brought about total recall within 30 days or not at all. This testimony was in direct contradiction to plaintiff's testimony that she began recalling things in 1968, and seemed to raise a serious question as to the credibility of the plaintiff and her true recollection of the accident at time of trial. As impeaching evidence, Dr. Robinson's testimony was potentially devastating. Despite this, the jury found plaintiff to be more credible. This was totally within its province to do so. As Dr. Robinson's testimony went to essentially the same facts and issues as the offered evidence of the pre-trial statement, the trial court properly refused to admit what would have amounted to cumulative evidence. A new trial should not be granted on the basis of the excluded evidence.

## Instructions to the Jury on Circumstantial Evidence

In charging the jury on negligence, the trial judge stated that negligence could be determined either on the basis of plaintiff's testimony or circumstantial evidence which would indicate that defendant permitted his truck to pass to the wrong side of the road. Appellants argue that this was error. They submit that if the jury were to disbelieve the plaintiff's story, there simply was not sufficient circumstantial evidence to establish negligence. The physical evidence at the scene was entirely inconclusive and a determination of liability would be entirely speculative. They argue, therefore,

that a new trial is mandated. Since one of the alternative grounds for determining negligence was not present, an instruction permitting a finding of liability on *either* of the grounds was prejudicial and reversible error. *Izzi v. Philadelphia Transportation Co.*, 412 Pa. 559, 195 A. 2d 784 (1963) (new trial granted since no basis for finding negligence under exclusive control doctrine, and common law negligence had to be relitigated).

As we have already stated, it is not our function to review the evidence and substitute our judgment where a jury could reasonably conclude that the weight of the evidence was consistent with liability. In discussing the propriety of the trial court's instruction to the jury, we must examine not only the question of whether such a reasonable basis existed, but whether the instruction itself was fairly submitted to the jury for consideration.

Appellants cite only a portion of the charge. The entire charge, however, sheds quite a different light on the words cited and taken out of context by the appellants:

"Now if you come to the conclusion that you do not accept her testimony that the collision took place by reason of the truck coming over on the left side of the highway, you can look to the other evidence in the case to see whether that evidence permits you to draw a reasonable inference as to how the accident happened, and that it happened with the defendant, Melcher, crossing over to the northbound lane of traffic. That would be, if you looked at the pictures and other evidence in the case aside from Mrs. Eldridge's testimony—that may be—I say 'may be'—circumstantial. There may be in there other evidence, circumstantial evidence, of how the accident happened. I am not saying that there is or is not enough of the other evidence in the case to justify an inference, a conclusion by you, as to how the

accident, in fact, took place, and as to whether the defendant, Mr. Melcher, was in error. But that type of evidence would be circumstantial, what is known as circumstantial evidence, because it is not the result of somebody directly and positively seeing what had happened, and therefore, I must charge you on the law with respect to circumstantial evidence, and it is this: When a party who has the burden of proof—and that would be Mrs. Eldridge in this case—when a party who has the burden of proof relies upon circumstantial evidence and inferences reasonably deducible therefrom, such evidence, in order to prevail, must be adequate to establish the conclusion sought and must be so preponderate in favor of that conclusion as to outweigh in the minds of the fact-finder any other evidence and reasonable inferences therefrom which are inconsistent therewith. Therefore, if you rely on testimony other than her direct statement to establish the negligence of the defendant Melcher, that evidence must preponderate in favor of the conclusion that he was negligent and must outweigh any other evidence or reasonable inferences from the same evidence that are inconsistent with his negligence.

"If it is established in your mind either by the testimony of Mrs. Eldridge or by circumstantial evidence that the defendant's vehicle was being operated on the wrong side of the highway at the time of the collision, this is sufficient evidence to justify you in finding that the defendant Melcher was negligent in the operation of his vehicle, in the absence of an explanation accepted by you, the jury, that the defendant's vehicle was there lawfully and through no negligence on the part of the driver." (Emphasis added) It is quite clear from the full text that the trial judge went to great lengths in his charge to advise the jury that there may or may not be other circumstantial evidence in the case which would permit a reasonable inference of negligence. As

the instant case hinged on the circumstantial evidence and plaintiff's testimony, it was entirely appropriate for the trial court to instruct the jury with respect to circumstantial evidence.

Defense counsel, at the close of the charge, did not object to the charge in the form which he now raises impropriety. Instead, acknowledging the need to instruct on circumstantial evidence, he asked merely for a "more specific" charge on what should be considered and that the jury must apply "their good common judgment to what they can deduce and evolve from that." In complying with that request, the trial judge gave the following additional instructions:

"THE COURT: 'Ladies and Gentlemen of the Jury, when I was talking to you I thought that I had said that you will examine all the physical exhibits, namely, the photographs, particularly the photographs, to determine whether they assist you in any way in determining whether the plaintiff has met her burden of proof of showing negligence on the part of the defendant, and it may have been that I said to look at the position of the vehicles and limited my statement to that. If I did, I did not intend to so limit it. I think that you should look at everything in the pictures and examine the pictures thoroughly and the exhibits thoroughly and use your good, sound, judgment in determining whether they are of any assistance to you in determining whether they establish negligence on the part of the defendant in the operation of his vehicle.' " (Emphasis added)

Taken as a whole, we cannot say that the charge of the court did not constitute a fair, clear, comprehensive, and correct statement of the principle of law applicable to the case and the duties and obligations of the jury with respect to weighing the sufficiency of the evidence before them. *Voltz v. General Motors Acceptance Corp.*, 332 Pa. 141, 2 A. 2d 697 (1938). Un-

less there was a complete absence of circumstantial evidence upon which the jury could reasonably infer the existence of negligence, the charge of the court was entirely correct and proper.

In reviewing the record, we find ample circumstantial evidence from which a jury could infer negligence. The jury could determine that there was negligence if they were convinced that the defendant's truck crossed over onto the wrong side of the road where plaintiff was driving her car. First, there is the testimony of Mr. Garrison, who said that he observed the plaintiff just a mile from the scene of the accident, and that she was operating her vehicle with what appeared to be a reasonable rate of speed and with control over her vehicle. Mrs. Nancy Long testified that she observed the truck prior to impact and that it was traveling "fast". She said that she turned away and heard the screeching of the truck's brakes at the curve in Route 611. She then heard the crash and observed the truck in midair. The photographs of the accident scene established the sharpness of the curve, and that plaintiff was traveling just prior to impact on a straight portion of the road, while the truck would have been rounding the curve. The photographs graphically disclose the violence of the impact, which would support an inference of one or both of the drivers as driving at an excessive speed. The road conditions were wet and it was raining. The debris at the scene was inconclusive. While the bodies of the children were strewn on the truck's side of the road, the sand which had spilled out over the road (the truck had been carrying a full load of sand) was found on plaintiff's side of the road. From the evidence, it is not unreasonable that the jury concluded that the defendant and not the plaintiff had crossed over to the wrong side of the road while negotiating the sharp curve under wet road conditions. It must be remembered that it is a basic legal principle

that all the evidence must be considered upon review in the light most favorable to the verdict winner. *Sollinger v. Himchak*, 402 Pa. 232, 166 A. 2d 531 (1961). The jury's verdict was not contrary to or against the clear weight of the evidence, and there was nothing which would compel this Court to overrule the trial court's refusal to grant the defendants a new trial.

Order and judgment are affirmed.

WATKINS, J. concurs in the result.

---

DISSENTING OPINION BY SPAETH, J.:

This is an appeal from an order denying a motion for judgment n.o.v. or for a new trial. I agree with the denial of judgment n.o.v., but I disagree with the denial of a new trial. Although several of the arguments presented on behalf of appellants, who were defendants below, are without merit and were properly disposed of by the lower court, two of the arguments in my view have not only merit but also a general importance that requires the most careful discussion.

The nature and history of the case may be summarized as follows: On August 1, 1963, plaintiff Delta N. Eldridge* while driving north on a two-lane highway collided with a truck being driven south by defendant Lester Melcher. The truck was owned by defendant Elmer O. Strouse. Melcher was Strouse's employee and in driving the truck was acting within the scope of his employment. As a result of the collision, plaintiff was seriously hurt; two of her four children were riding with her, and were killed. The principal issue at the trial was how the accident had happened. The defendant truck driver had died (not from the accident) without being deposed, and plaintiff was the only eyewitness. On November 12, 1970, a jury returned a verdict

---

* Herman L. Eldridge is no longer a plaintiff, he and Delta N. Eldridge having been divorced.

of $150,000 for plaintiff and against both defendants. On July 19, 1972, defendants' motion for judgment n.o.v. or for new trial was argued. On September 8, 1972, the motion was denied.

### The Asserted Weakness of Plaintiff's Testimony

On direct examination plaintiff said she left her home with the two children a little after one o'clock in the afternoon to go to the home of a friend (a Mrs. Betty Degen) to have a letter notarized. She went about three miles to the intersection of Routes 412 and 611, turned left, and proceeded north on Route 611. The direct examination continued: Q. Can you tell us what you did as you travelled north on 611 from the intersection with 412? A. I went up the road about a mile north until I came to a large curve, and the curve curves right, and as you go around this curve the curve tries to pull your car sort of toward the middle. I hung onto the wheel and went on around the curve on my side of the road until I was to the straight part again. I could see a big dump truck coming toward me. It kept coming. It hit me on my side of the road.

On cross-examination plaintiff added to this account. She said that "[i]t was raining very hard" and was "dangerous" but "the sun was shining too . . . you could see good." She said that just before she entered the curve her speed was about thirty-five miles an hour, and that as she entered the curve she slowed to about thirty miles an hour, because of "[t]he weather and a rainy road." She recalled saying to her children something like "I wish it wasn't raining." She went on to describe how, after getting around the curve, she saw the truck coming toward her, "about a block away, I suppose", after which the following occurred: "Q. And you can't tell me how fast [the truck was going]? A. No. * * * Q. Was it on its side of the road? A. Yes.

Q. And then what happened that you recall? A. It looked like he was swaying. * * * Q. Was this when you first saw him? A. No. The first reaction—thing I remember was I saw him. I was saying, "Oh, my God, what a big truck." Q. All right. That was your first reaction, that it was a large truck? A. Yes. * * * Q. What did you do? A. I was just driving. * * * Q. You were just driving in a straight line? A. Yes. Q. You were driving at a speed of thirty-five miles an hour? A. Yes. Q. You were driving on your side of the road? A. Yes. Q. And then suddenly did he come over and strike you? A. I guess he did. Q. You guess he did. You do not remember that? A. Well, at that second that was the end. Q. Do you recall seeing him come on your side of the road? A. It was like he was swaying. Q. You say it was like it was swaying, but I ask you again: Do you actually recall, specifically recall with clarity, his wheels getting over the center line onto your side of the road? A. I knew he was too close to me. Q. You knew he was too close to you. I ask you again, and I don't mean to belabor it, but do you recall seeing him cross that center line and come on your side of the road? A. It happened so fast I can't actually say. He hit me. Q. All right. In other words, do I understand your answer to be that you cannot tell me, because it happened so fast, that he actually did come on your side of the road? A. Yes. Q. Now, as you recall, you were constantly on your side of the road? A. Yes, I was. Q. Do you recall at any time your car sliding or skidding as you went around the curve? A. No. * * * Q. Do you recall at any time taking any evasive action with your automobile, and by that I mean trying to steer your car so as to avoid the accident? A. No. * * * Q. Did you put on the brake? A. No. I don't think I did. Q. And it happened all of a sudden, and after that your mind was pretty much of a blank; is that correct? A. Yes. I kept asking for

my children. * * * Q. Do you remember anything at the scene of the accident, Mrs. Eldridge? A. No, I don't remember seeing anyone."

Granted that plaintiff's testimony was weak, there is no merit to the contentions advanced by counsel for defendants that the testimony "was incredible as a matter of law", and was so weak that the verdict was "manifestly against the weight of the evidence." It was within the jury's power to accept plaintiff's answers on direct examination, and to discount her answers on cross. Defendants' motion for judgment n.o.v. was therefore properly denied. Upon a defendant's motion for judgment n.o.v. the court must regard the testimony from the viewpoint of the plaintiff; it is without power to enter a judgment n.o.v. simply because of inconsistencies in the testimony. *Willetts v. Butler Twp.*, 141 Pa. Superior Ct. 394, 15 A. 2d 392 (1940). All doubts must be resolved in favor of the verdict, and it is only in a clear case that judgment may be entered against the verdict. *Pantuso v. Pgh. Motor Coach Co.*, 360 Pa. 464, 62 A. 2d 56 (1948). My difficulty is that the jury was disabled from making a proper evaluation of plaintiff's testimony because the trial judge excluded certain evidence, which I shall discuss next.

### The Impeachment of Plaintiff's Testimony

Defendants' response to plaintiff's testimony was that she could not remember the accident and that her detailed account of it was based on her imagination. To this end defendants' counsel asked plaintiff on cross-examination about a deposition she had given in January, 1965 (a little less than a year and a half after the accident).

It is conceded that one of the results of the accident was that plaintiff suffered amnesia. In her deposition she had testified, "No, I don't know on

which side of the road it happened". When asked, "And you wouldn't even know except from what somebody may have told you, that it was a truck that you were involved in the accident with?", she had answered: "I never saw it." "How do you know you never saw it?" "I mean I don't, I don't remember." "Since the accident, has your memory increased any? Have you started to recall any of it?" "No. I have tried and tried."

In explaining the apparent contradiction between her testimony in 1965, on deposition, and in 1970, on trial, plaintiff said that her memory had gradually returned. When pressed to explain "gradually," she said that as she became less emotional about the death of her children, her mind became "clearer". The following testimony ensued: "Q. You say you are not as emotional about the children as you were, and you think that's why your mind cleared up? A. Yes, I do. Q. So, am I correct in saying that up until 1968 your mind was a blank as far as what happened on the day of this accident? A. I think it was, yes. Q. In other words, you could not remember any of the details; is that right? A. Not too many, no. Q. And was that in the winter, spring, summer, fall? A. That I started to remember? Q. Yes. A. Summer. * * * Q. When did you tell your attorney that you started to remember things? A. Around '68. Q. It was 1968 that you told your attorney that you started to remember things; is that correct? A. Yes. Q. And that attorney would be Mr. Williams [her trial counsel]; is that correct? A. Yes."

In addition to cross-examining plaintiff about the difference between her deposition testimony and trial testimony, defendants' counsel offered the testimony of Joseph Robinson, a doctor who specialized in psychiatry and neurology. Dr. Robinson had examined plaintiff on November 5, 1970—four days before the trial be-

gan. When asked to explain how plaintiff in view of her history of amnesia could have testified on Tuesday —the doctor was testifying on Thursday—that she nevertheless remembered the accident, the doctor said: "A. Well, it is not actual recall. What it is, is a matter of piecing together bits of information about the accident that come from a variety of sources, and then constructing some kind of story out of it which is understandable that an individual like this would want to know what happened and, therefore, grasps pieces of information to create a story, especially if such a story helps her to absolve her own self or her own feeling of guilt. I am not saying that is guilty of anything, but if a person feels guilty they will grasp onto bits of information that will absolve them from such feelings. Q. Is this a normal, human behavior to do this? A. Yes, I would say that this is normal for people to do this. Q. Now, the fact that she would grasp, as you say, certain bits of information and so, in effect, reconstruct a story, would this be done consciously and deliberately on her part? A. No. No. This is not a matter of malingering or trying to be devious in any way. This is an unconscious thing."*

At the conclusion of Dr. Robinson's testimony, defendants' counsel offered to show that it had been stated at the pre-trial conference that plaintiff did not recall the circumstances of the accident—a statement consistent with Dr. Robinson's testimony and with plaintiff's

---

* On rebuttal plaintiff's counsel called Albert M. Honig, a doctor who specialized in psychiatry. He agreed that plaintiff had suffered amnesia as a result of the accident. When asked, "Is there any way with reasonable medical certainty, doctor, to state whether or not in a patient who suffered the trauma that you now know Mrs. Eldridge suffered for that person to regain all or a percentage of her repressed memory?", he answered, "Definitely." He was not asked, and did not offer, his opinion whether plaintiff in fact had "regain[ed] all or a percentage of her repressed memory."

1965 deposition but inconsistent with plaintiff's trial testimony. The offer was as follows: "MR. BOWEN [for defendants]: I would like to offer into evidence, if the Court please, by a statement by the Court to the effect that the pre-trial order of December 1969 reveals that the plaintiff did not have a recollection as to the circumstances of the accident. MR. WILLIAMS: [for plaintiff]: Your Honor, there is no question but that in paragraph five of the Court's report that statement is contained, but nowhere in the plaintiff's pre-trial memorandum does it appear unless I have, you know, missed it in my quick perusal, and it does not appear in Mr. Bowen's pre-trial memorandum. Now, this may be inadvertence on my part of recalling what the facts had been, but I don't think you will find it anywhere that I said that in a written document. I am the last one to say I recall every word that was said at that pre-trial conference. THE COURT: Are you objecting? MR. WILLIAMS: Yes, I certainly object. THE COURT: I will sustain the objection, but my recollection* is that it was definitely stated by Mr. Williams, in accordance with the second paragraph under item five of the pre-trial conference. MR. BOWEN: It's your recollection that he did say it? THE COURT: Yes. MR. BOWEN: At the pre-trial conference in December? THE COURT: Yes. I will not admit that in evidence."

The Exclusion of the Pre-Trial Conference Statement

It was error to exclude the statement by plaintiff's counsel to the pre-trial conference judge that as of December 1969 plaintiff did not remember the circumstances of the accident. The statement was relevant because it contradicted plaintiff's testimony with respect to the most critical issue of the case, which was

---

* The trial judge had also been the judge at the pre-trial conference.

whether she remembered how the accident had happened; and it was competent as a vicarious admission.

It is true that at trial plaintiff only testified that she "started to remember" the accident in the "summer" of 1968, without saying when she had recovered her memory to the point of being able to give the detailed account she gave at trial. It is also true that when plaintiff was asked, "When did you tell your attorney that you started to remember things?" she first only replied, "Around '68." However, when asked, "It was 1968 that you told your attorney that you started to remember things; is that correct?", she answered, "Yes". Assuming (the assumption most favorable to plaintiff) that it was not until December 1968 that plaintiff spoke to her attorney, still, that was a year before the pre-trial conference, which was in December 1969, and the jury could reasonably have concluded that if she really began to remember in 1968, it could not truthfully be said at the pre-trial conference in 1969 that she did not remember how the accident had happened. Thus the jury could have found the pre-trial conference statement inconsistent with plaintiff's testimony.

Nor is this conclusion affected by the fact that there was apparently no written statement filed by plaintiff's counsel at the pre-trial conference. The trial judge was also the pre-trial conference judge, and he stated at the trial that "my recollection is that it was definitely stated by Mr. Williams [at the pre-trial conference], in accordance with the second paragraph under item five of the pre-trial conference." Furthermore, the court below in its opinion states: "At a pre-trial conference held before the undersigned, counsel for the plaintiff stated that the plaintiff no longer recalls the circumstances of the accident. The pre-trial conference report was made by the undersigned and under paragraph 5 thereof, which is entitled 'Unusual legal problems if

any,' the following question is posed: 'Does presumption of due care apply to Melcher [the defendant truck driver], and to plaintiff who no longer recalls circumstances of accident.' " Thus there was and can be no doubt regarding what was said at the pre-trial conference.

It does not appear whether plaintiff was present during the pre-trial conference and heard what was said or whether in some other way she adopted counsel's statement. In some jurisdictions this fact might preclude admission of the statement. *Hogenson v. Service Armament Co.,* 77 Wash. 2d 209, 213-14, 461 P. 2d 311, 313-14 (1969), cited and stated in IV Wigmore on Evidence §1063 n.1 (1972). It is settled under Pennsylvania law that the statement should nonetheless have been admitted.

Under our cases a distinction is drawn between an attorney's statements going to the very maintenance of a cause of action, and those made incident to pending litigation or negotiations that the attorney was engaged to conduct. Statements going to the cause of action will not be admissible against the client absent proof of special authority, but statements incident to the conduct of the trial will be admissible as within the attorney's implied authority. *Archbishop v. Karlak,* 450 Pa. 535, 299 A. 2d 294 (1973). The statement by plaintiff's counsel in the present case was admissible as incident to the trial, as may be seen from the two cases most in point: *McGarity v. N. Y. Life Ins. Co.,* 359 Pa. 308, 59 A. 2d 47 (1948), and *Fessman Estate,* 386 Pa. 447, 126 A. 2d 676 (1956).

In *McGarity* the claim was for double indemnity benefits payable for accidental death. The decedent had died while driving his car, and his executors maintained that death was accidental in that it had resulted from the collision between the car and a house owned by a Mrs. Clasby. The carrier argued that death had

resulted from hemorrhages, which had caused the decedent to lose consciousness and hence control of his car. At the trial, counsel for the carrier were permitted to place in evidence correspondence between counsel for Mrs. Clasby and counsel for decedent's executors. The correspondence had arisen in connection with Mrs. Clasby's claim for property damages caused by decedent's car running into the house. The jury returned a verdict for the carrier. Affirming, the Supreme Court held: "In this correspondence counsel for plaintiffs denied their clients' liability for the accident because, as they said, their information was that McGarity had been seen to slump at his wheel, apparently unconscious from a heart seizure prior to the accident, and they cited legal authorities to show that under such circumstances he was not responsible for the accident which followed. Counsel were clearly acting within the scope of their authority in making such a statement, and therefore, it being pertinent to the present issue, it was admissible in evidence with the same force and effect as if it had been made directly by plaintiffs themselves: Truby v. Seybert, 12 Pa. 101; Floyd v. Kulp Lumber Co., 222 Pa. 257, 268, 71 A. 13, 15; Muzychuk v. Yellow Cab Co., 343 Pa. 335, 341, 22 A. 2d 670, 673; Cherry v. Mitosky, Administrator, 353 Pa. 401, 406, 45 A. 2d 23, 26." *McGarity v. N. Y. Life Ins. Co.,* supra, at 314, 59 A. 2d at 50.

In *Fessman* a claim for support of a child during minority was brought by the mother of the child against the estate of the deceased father. It was recognized that a father has no obligation to provide that his estate support his minor child. An exception to this rule, however, arises when the father has made a contract to support the child. In support of the assertion that the father had made such a contract, the mother was permitted to offer the testimony of her attorney, a Mr. Graham. It appeared that incident to the settlement of

marital difficulties the father had written the mother's attorney a letter promising to support the child "in lieu of" a court order. The mother's attorney testified that when he had called the father's attorney to say that the letter was ambiguous, the father's attorney had replied that the father's "word was good for the support of the boy during his minority." *Fessman Estate, supra* at 452, 126 A. 2d at 678. The auditing judge believed this testimony, ruled that it was admissible to explain an ambiguous writing, and awarded most of the father's estate to a trustee for the minor child. Affirming, the Supreme Court held: "The aforesaid conversation with, and admissions by, Fessman's attorney are admissible in evidence with the same force and effect as if they had been made directly by Fessman himself, since Fessman's counsel was acting within the scope of his express or implied authority to negotiate a settlement with Fessman's wife of their marital difficulties and her claims for alimony and the support of their son: McGarity v. New York Life Insurance Co., 359 Pa. 308, 314, 59 A. 2d 47; Cherry v. Mitosky, Administrator, 353 Pa. 401, 406, 45 A. 2d 23, 26; Truby v. Seybert, 12 Pa. 101; Floyd v. Kulp Lumber Co., 222 Pa. 257, 268, 71 A. 13, 15; Henry, Penna. Evidence, 4th Ed., Vol. 1, §96, p. 143. While Graham's testimony, like Fessman's letter, was not as clear as it could or should have been, we believe, considering the subject-matter and the objectives of the parties, that it was sufficient, taken in conjunction with Fessman's letter of July 15th, to establish that Fessman agreed to support his son during his minority." *Id.*

In principle both *McGarity* and *Fessman* are indistinguishable from the present case; indeed, *McGarity* goes further. In *Fessman,* as in the present case, a reasonable inference was that the attorney was repeating what his client had told him (in *Fessman,* "I will support my boy during his minority"; in the present case,

"I do not remember how the accident happened") ; but in *McGarity* the attorney's statement was based, not on what the decedent had said regarding how the accident had happened (the decedent never recovered consciousness after the accident), nor so far as it appears on what the attorney's client (the decedent's executors) had said, but rather on what someone else (unidentified) had said, and yet the attorney's statement was admitted. Thus *McGarity* demonstrates that the admissibility of an attorney's statement made incident to the trial does not depend upon whether it is a reasonable inference that the attorney is repeating what his client has told him—although, as mentioned, that is a reasonable inference here—but on whether the attorney in making the statement is acting within his authority.

It remains to consider why, despite the foregoing, defendants' exceptions to the trial judge's refusal to admit in evidence the statement by plaintiff's counsel at the pre-trial conference that plaintiff "no longer recalls circumstances of accident" were dismissed .

The court below states that defendants' counsel did not "offer to place in evidence the pre-trial conference statement made by plaintiff's counsel that plaintiff had no recollection of the circumstances of the accident" but instead "request[ed] that the trial judge state to the jury that 'the effect of the pre-trial order of December 1969 reveals that the plaintiff did not have a recollection as to the circumstances of the accident.' " What defendants' counsel did was "to offer into evidence, if the Court please, by a statement by the Court to the effect . . . [etc.]." The pre-trial order had been filed of record over the signature of the pre-trial judge, who was also the trial judge. There was never any question that counsel was offering into evidence the recorded statement by plaintiff's counsel, as was at once demonstrated by plaintiff's counsel's response to the offer, which was that the statement appeared neither in

plaintiff's nor defendants' pre-trial memorandum, and that even though it was recorded, he did not recall saying it.

The court below next states that the statement that plaintiff "no longer recalls circumstances of accident" is "an assumed fact based upon the statement of counsel. It is not a judicial finding of the lack of recall and was not intended so to be." This observation is beside the point. In telling the jury what the pre-trial conference report showed plaintiff's counsel had said, the court could, and should, have explained that he was not making any "judicial finding of . . . lack of recall," and that it was the jury's duty to decide whether counsel's statement that plaintiff "no longer recalls" was accurate.

The court below next states that "had there been a finding of lack of recall it necessarily would have related to the time of the finding and could not have been prospective to the time of trial. The requested charge [sic; the request, as has been seen, was not for a charge], if given, would have been tantamount to a judicial determination that as of the time of trial plaintiff had no recall, and undoubtedly would have been so construed by the jury (in the absence of further instructions). This, in effect, would have been telling the jury that plaintiff's testimony that she had recall and her description of the accident were perjured fabrications."

These remarks both misconstrue and misstate the offer. There was no request that the judge tell the jury that "as of the time of trial" plaintiff had no recollection, but only that he tell the jury that as of the time of the pre-trial conference (one year before the trial) her counsel had said that she had no recollection. The point of the offer was to enable defendants' counsel to argue to the jury: (1) that it should find that as of the pre-trial conference in December 1969 plaintiff did

not remember how the accident had happened (or why would her attorney have said so? was he not repeating his client's statement?) ; (2) that therefore plaintiff had not told the truth when she testified that in the summer of 1968 she had started to remember how the accident had happened and had sometime in 1968 told her attorney so; and (3) that this supported Dr. Robinson's testimony that plaintiff's detailed account of the accident on her direct examination was not based on fact but was imagined in order to relieve her understandable desire to know how it was that her children had been killed while she was driving. So far as concerns the reference by the court below to "perjured fabrications": Dr. Robinson expressly stated that in his opinion plaintiff had imagined her account of the accident "to absolve her own self or her own feeling of guilt" and was not "malingering or trying to be devious in any way"; but in any case, defendants had every right to argue that the contradiction, as the jury might find it to be, between plaintiff's testimony with respect to her memory in 1968 and her counsel's statement with respect to her lack of memory in 1969, did indeed show that she was not telling the truth.

Finally, the court below states that to admit evidence of the statement by plaintiff's counsel "would have opened a series of collateral issues," "would have placed the trial judge in the position of a witness," and "would have placed plaintiff's counsel upon election as to whether he would take the stand."

It may be granted that if evidence of the statement had been admitted, plaintiff's counsel might have felt obliged to take the stand. Perhaps, for example, counsel made the statement on the basis of old material in his file—for example, the 1965 deposition—and not on the basis of a 1969 conversation with his client, in which case it would have been appropriate for him to testify in rebuttal. I cannot share the concern of the court

below that counsel would then have been obliged to withdraw as trial counsel. Other counsel could have been engaged; and if that could not have been done without unduly interrupting the trial, a mistrial should have been declared.

The possibility that the trial judge might have had to testify, and the danger of "open[ing] a series of collateral issues," may be considered together. It seems most unlikely that the trial judge would have had to testify. The court below expresses the fear that the judge would have had to go into an "explanation of the pre-trial conference, its purpose and what was said thereat." Although such an explanation might have raised collateral issues, there was no necessity for the explanation to be given. The offered fact was only that in December 1969 plaintiff's counsel had stated to the judge that plaintiff "no longer recalls circumstances of accident"—a simple enough fact the accuracy of which —as has been discussed—is established by the statements of the court below, both at trial and in the opinion for the court en banc.

Let us assume, however, that it would have been necessary to declare a mistrial, whether because plaintiff's counsel testified, or because the trial judge decided that he himself would have to testify. A mistrial is not a result to be avoided at any cost; and in the present case the cost of not declaring one, or of not now awarding a new trial, is higher than I am willing to pay. The issue is not only how to decide an interestng point in the law of evidence; beyond that, it is whether we are going to insist upon the integrity of the trial process.

Rule DR 7-102(A) of the Code of Professional Responsibility provides:

"In his representation of a client, a lawyer shall not:

. . .

"(4)  Knowingly use prejured testimony or false evidence.

. . .

"(6)  Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

"(7)  Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

I do not suggest that any of these events occurred. The point is that the record should demonstrate that they did not. It may well be, that as plaintiff's counsel heard plaintiff testify that she had started in the summer of 1968 to remember how the accident had happened, and that sometime during 1968 she had told him of this return of memory, counsel had no reason to believe that the testimony was false; she may have been telling the truth. Suppose, however, that the fact is that in December 1969, just before the pre-trial conference, plaintiff told counsel that she still did not remember how the accident had happened. Not only was the jury entitled by the law of evidence to know that fact; it was counsel's professional responsibility not to use, or assist his client in using, testimony he knew to be false.

We must insist upon an honorable legal profession, else we are lost. Nor can we afford to await the great occasion. The purity of our institutions depends upon what we do day by day. "Rightly to be great/Is not to stir without great argument,/ But greatly to find quarrel in a straw/When honor's at the stake." Hamlet, IV, iv, 53-56.

## The Circumstantial Evidence

A second reason a new trial should be awarded is for error in the charge with respect to the circumstantial evidence. The charge was as follows: "If it is estab-

lished in your mind either by testimony of Mrs. Eldridge or by circumstantial evidence that the defendant's vehicle was being operated on the wrong side of the highway at the time of the collision, this is sufficient to justify you in finding that the defendant Melcher was negligent in the operation of his vehicle, in the absence of an explanation accepted by you, the jury, that the defendant's vehicle was there lawfully and through no negligence on the part of the driver." Defendants' counsel excepted to this charge, stating: "MR. BOWEN: I would also take exception to that portion of your charge in which you say: 'If you do not accept her version of the accident, in other words, as not credible, then you can look to the other facts to determine whether there was negligence; and I submit that without her being accepted there isn't enough to go to the jury, which would be consistent with my motion for Involuntary Non-Suit.' " This exception was well taken.

In cases such as this, the plaintiff has the burden of proving by a fair preponderance of the evidence that the defendant was negligent and that his negligence was the proximate cause of the accident. *Schofield v. King*, 388 Pa. 132, 135, 130 A. 2d 93, 95 (1957). Although this burden can be met with circumstantial evidence, *Carter v. United Novelty & Premium Co.*, 389 Pa. 198, 132 A. 2d 202 (1957), the jury cannot be permitted to reach its verdict merely on the basis of speculation or conjecture. *Schofield v. King, supra.* "[I]f circumstantial evidence is relied upon for recovery, it must describe, picture or visualize what actually happened in order to enable the fact-finding tribunal reasonably to conclude" that the plaintiff has met his burden. *Laubach v. Haigh*, 433 Pa. 487, 490, 252 A. 2d 682, 683 (1969). "For one offering only circumstantial evidence to prevail, the evidence must so preponderate in favor of the offeror's conclusion that it outweighs any other evidence and reasonable inferences therefrom which are

inconsistent therewith." *Houston v. Canon Bowl, Inc.,* 443 Pa. 383, 387, 278 A. 2d 908, 911 (1971).

The circumstantial evidence in the present case may be summarized as follows: Plaintiff's car collided with a dump truck loaded with sand. A woman who lived near the scene of the accident testified that: she looked out her window when she heard the truck's brakes, thinking it might be her husband coming home; the truck was going south, in the southbound (or proper) lane, and she saw nothing unusual about it; she could not estimate its speed; she returned to her reading, immediately heard a crash, looked out the window again, and saw the truck upside down, "in the air", "still in the southbound lane"; she did not see what lane the truck came down in. Pictures taken soon after the accident showed the relative positions of the vehicles, their condition, and the nature of the area. Plaintiff's car was smashed on its right front side (passenger's side) as it was going north. The truck was smashed on its left front side (driver's side) as it was going south. The truck was most of the way off the west (or its right) side of the road facing west. The car was all the way off the east (or its right) side of the road and also facing west. Sand was in a semicircle around the truck with some of the sand crossing over into the east side lane (which would be the wrong lane for the truck to be in). One child's body was found in the grass beyond the west lane (which would be the wrong lane for the car to be in). The other child's body and one of the car's doors were found in the west lane, near the western edge of the road.

There was no expert testimony interpreting the pictures or otherwise explaining how the accident probably happened. Perhaps an expert might have been able to offer such an explanation. As it is, however, the evidence is totally ambiguous. The fact that the car was smashed on its right front side suggests that the car

swerved just before the collision, in spite of plaintiff's testimony that she did not; but that does not tell us who was on the wrong side of the road. It might be argued that the fact that the sand was spread over onto the east lane shows that the truck was in the east (wrong) lane; but it might also be argued, and with at least equal force, that the fact that the children's bodies and one of the car's doors were in (or beyond) the west lane shows that the car was in the west (wrong) lane, and in support of this argument the damage to the car's right front side might be cited. The collision obviously was very forceful, so that it is not surprising either that sand was thrown from the truck or that the children and part of the car were thrown from the car. If anything, the damage to the car suggests that the car was in the wrong lane; at least, I cannot visualize how the accident happened unless the car was in the wrong lane. On the other hand, the car did end up on its right side of the road. But then, so did the truck.

The only other witnesses called by plaintiff were a State trooper, the photographer who had taken the photographs to which the trooper referred, and (as on cross-examination) defendant owner of the truck. Although plaintiff's counsel asked the trooper whether it was not true that the trooper had "investigated a vast number of accidents" (to which the trooper replied, "Yes, sir"), counsel did not ask the trooper what his investigation in the present case had revealed regarding the cause of the accident; he only asked the trooper to describe the scene. On cross-examination defendant's counsel asked the trooper whether he had gotten "a complete statement as to how the accident occurred" from defendant truck driver. The trooper answered that he had, but upon objection by plaintiff's counsel he was not permitted to say what the statement had been. (The trooper had stated on direct examination

that he had not been able to get a statement from plaintiff "[d]ue to her injuries.") On cross-examination of defendant owner, plaintiff's counsel showed that the truck was loaded with 15,200 pounds of sand. There was no suggestion, however, that this was an excessive or unusual load, or that there was anything wrong with the truck, as for example, with its brakes.

In discussing the circumstantial evidence the court below generally confines itself to stating what the evidence was, without addressing itself, or so it seems to me, to the fact that the evidence proved that plaintiff was on the wrong side at least as much as that the truck was.

The court below states that the photographs "establish that at or around the immediate accident scene there was a sharp curve, which the defendants' truck would have to negotiate had it continued its southbound journey on Route 611, and that, therefore, the truck driver's assured clear distance ahead was sharply curtailed and he was under a legal duty to act accordingly and keep the operation of the truck under control in the situation." However, there is no evidence that the truck driver did not have the truck under control; and the testimony of the witness who saw the truck immediately before the accident indicates that he did, for she said the truck was proceeding in its proper lane and that she saw nothing unusual about it. The assured clear distance ahead rule therefore has no application. *See, e.g., Long v. Pa. Truck Lines, Inc.*, 335 Pa. 236, 5 A. 2d 224 (1939) (a driver who stays on his side of the road may assume that an approaching driver will do the same; the assured clear distance rule does not require that as he turns a curve he must anticipate that an approaching driver might occupy the center of the road).

Next the court below states: "The exhibits also graphically disclose the violence of the impact and this,

in conjunction with the testimony of Mrs. Long, leads to a supportable inference that the truck was travelling at an excessive speed under the circumstances and the driver thereof did not have his vehicle under sufficient control at the relevant time. The photographs in conjunction with the stipulation of the parties, also established the distance between the two motor vehicles after they came to rest subsequent to the accident which can properly lead to the same conclusion."

I can only confess that I do not understand this statement. Mrs. Long was the witness who saw the truck just before the accident. As already mentioned, she testified that the truck was on its side of the road, and that although she could not estimate its speed, she saw nothing unusual about it. Such testimony does not seem to me to lead "to a supportable inference [of] . . . excessive speed . . . and . . . [in]sufficient control." The photographs did show the respective positions of the vehicles; I have already explained why in my view if any inference can be drawn from those positions, it is that of the two vehicles, plaintiff's was on the wrong side.

Finally the court below states: "There is no evidence that Mrs. Eldridge, the plaintiff, was travelling at an excessive rate of speed, Mr. Garrison gave no estimate thereof. The fact that her car negotiated a sharp 'S' turn and was on the straightaway thereafter at the time of the collision would support an inference that her speed was not excessive under the circumstances." While it is true that there is no evidence that plaintiff was going too fast, neither is there any evidence that the truck was. The "fact" that plaintiff's car "negotiated" the curve and "was on the straightaway" is not part of the circumstantial evidence; it is only fact if one accepts as true plaintiff's testimony as an eyewitness. The circumstantial evidence does not exclude, and may even support, the inference that plain-

tiff did not negotiate the curve but went around it too fast, lost control, and, by the time she reached the straightaway, was on the wrong side of the road.*

Thus it was error to instruct the jury that it might find for plaintiff "[i]f it is established in your mind either by testimony of [plaintiff] or by circumstantial evidence that the defendant's vehicle was being operated on the wrong side of the highway. . . ." As counsel for defendants said in excepting, without plaintiff's testimony, there was no proof of negligence; and the jury should have been told that that was so. In appraising plaintiff's testimony the jury was entitled—in fact, under a duty—to consider the circumstantial evidence; but by itself the circumstantial evidence proved nothing. As one of the two alternative instructions going to a possible basis for the jury's verdict was incorrect, a new trial should be awarded. *See Izzi v. Philadelphia Transp. Co.*, 412 Pa. 559, 195 A. 2d 784 (1963) (jury instructed on basis of negligence and exclusive control doctrine that did not apply in case; new trial ordered).

### In Conclusion

As the court below observed, this case is indeed an "unfortunate occurrence." One can only have profound sympathy for plaintiff—whether or not she was on the wrong side of the road. (Some measure of plaintiff's sorrow may be gathered from Dr. Robinson's report that in December 1965 she attempted suicide; she also told the doctor that her husband left her because the children were killed.)

For my part, I have become increasingly troubled by our reliance in the law of torts on concepts of fault and freedom from fault. I recognize that the law of

---

* Plaintiff did testify that "the curve tries to pull you sort of toward the middle."

torts and the law of crimes were once almost indistinguishable, *see generally* T. Plucknett, A Concise History of the Common Law 373 *et seq.* (2d ed. 1936), and that beneath the concept of fault lie feelings of retribution; but perhaps we should try to diminish our reliance on such feelings. Apart from indulging our feelings, what do we accomplish? By denying recovery, or by imposing liability, for fault, do we in fact encourage either the parties to the law suit or anyone else to act more carefully? It must be a rare trial judge or trial lawyer who has not asked himself these questions, which the present case raises in so poignant a way. In the meantime, however, until the rules are changed, an appellate court should follow them.

The decision of the court below should be reversed, and the record remanded for a new trial.