**ROYAL INDEMNITY COMPANY et al.**

v.

**The CITY OF ERIE.**

**Civ. A. No. 18–71 Erie.**

United States District Court,
W. D. Pennsylvania.

March 21, 1974.

See also, D.C., 326 F.Supp. 571.

Andrew J. Conner, Erie, Pa., for plaintiffs.

Irving O. Murphy, Erie, Pa., for defendant.

## OPINION

KNOX, District Judge.

In the early morning hours of July 23, 1970, a large fire occurred in the City of Erie, a third-class city under the laws of Pennsylvania, in which a large warehouse and commercial building known as the Schultz Building at 212 East Eighteenth Street, Erie, Pennsylvania, was totally destroyed, resulting in claimed losses to building, contents, and for business interruption of approximately $1,400,000. The building was owned by a realty corporation known as 212 Realty Company. The business operated on the premises was owned by the A. F. Schultz Company, a related corporation, which suffered loss of the contents and interruption of its business. The plaintiffs are insurance companies which insured these corporate entities against loss by fire.

The fire had originally started in a building across the street on the south side of East Eighteenth Street known as the Hoffman Building. The blaze there was being actively fought by several municipal fire companies when the fire suddenly "erupted" and with great speed engulfed the whole building and immediately thereafter spread across the street to the Schultz Building on the north side of the street. The evidence indicates that strenuous efforts by the fire department were fruitless in attempting to stop this sudden burst of flame which jumped across the street. As a matter of fact, the fire hoses were burned and several pieces of fire equipment were destroyed or seriously damaged in this blaze and firemen barely escaped with their lives. The Schultz Building was protected by a fully operating sprinkler system and certain windows had been blocked up but nevertheless these precautions were inadequate to prevent the fire from jumping the street and destroying it. The suddenness and overwhelming character of the "eruption" were such as to give rise to a well founded suspicion of arson, but no arsonist has ever been brought to book.

The Hoffman Building where the fire originally started was a three-story wooden frame building approximately 40 feet in height. It was approximately 75 years old and, prior to 1967, it had been used as a storage facility for surplus food. In July, 1967, a fire occurred and subsequent to this there was an attempted arson. As a result of this, the insurance on the building was cancelled and the building remained uninsured and unoccupied except for certain motor vehicles therein from July, 1967, to July, 1970, when the fire occurred.

The plaintiffs did not contend that the City was negligent in fighting the fire. It was originally claimed that the City was negligent in not furnishing an adequate supply of water and not supplying sufficient water pressure to contain the fire but these grounds for recovery were not pressed at the trial. Instead, plaintiff relied on a claim that the Hoffman Building was unreasonably dangerous to the Schultz Building across the street, that it was a fire hazard and that the City Building Inspector should have required it to be rendered more secure or demolished it in enforcement of the Building Code of the City of Erie. It was further claimed the City should have required the removal of automobiles stored there.

After nine days of trial (including part of a day for jury selection), the jury found for the defendant. The jury further answered certain Special Interrogatories as follows:

1) "Do you find that the Hoffman Building as it existed during the period September 7, 1969 to July 23, 1970 was in an unreasonably dangerous condition as a fire hazard which made it unreasonably dangerous to the Schultz Building? Answer: No."

4) "Do you find that the presence of any automobiles, that is, so called live autos as distinguished from burned hulks, in the Hoffman Building was a proximate cause of the spread of the fire in the Hoff-man Building to the Schultz Building? Answer: No."

The negative answers to these questions made it unnecessary for the jury to consider Interrogatory No. 2 as to the City's negligence in not removing the alleged hazard and No. 3 as to contributory negligence or assumption of the risk.

The plaintiffs have now moved for a new trial alleging errors in selection of the jury, errors in limiting their expert testimony, erors in excluding certain building codes and certain errors with respect to the charge of the court. We will deal with the reasons presented in order.

## I. Errors with Respect to Selection of the Jury

■ The case in question was a diversity action, the plaintiffs being foreign corporations without principal places of business within Pennsylvania. Hence, since the events complained of all occurred in Pennsylvania, Pennsylvania law applied to this law suit. Plaintiffs contend that City of Erie taxpayers should have been excluded from the jury.

The Pennsylvania Statute with respect to this matter is found in 17 Purdon's Pa.Stats. 1173 (Act Apr. 16, 1840, P.L. 410) and reads as follows:

"No person shall be excluded from being a witness or juror in any suit, prosecution or proceeding in which any county, city, incorporated district, borough or township, is a party, or is interested, by reason of such person being, or having been an officer, rated citizen or inhabitant in such county, city, district, borough or township, or owning assessed or taxable property, or being liable to the assessment or payment of any tax therein."

In Patterson Water Co. v. Mifflin Borough, 69 Pa.Super. 441 (1918), the citizens of the defendant borough were held to be qualified as jurors in a suit against the borough. To the same effect is Romig v. Allentown, 2 Leh. 277 (1905). See also Comm. v. Delamater,

145 Pa. 210, 22 A. 1098 (1891) where the court said:

"There are cases constantly being tried, of a quasi public nature, in which jurors, as citizens and taxpayers, are interested to some extent. If such interest would disqualify a juror, cases might arise where an offender could not be tried in any county of the commonwealth, as, for instance, an indictment for the embezzlement of state funds."

■ The cases on this subject are collected in 18 A.L.R.2d 708 which annotation indicates a split of authority among the various states. Pennsylvania is listed as following the rule of no disqualification. There has been little litigation in Pennsylvania of this question, probably because of the statute above cited. We have found no controlling federal authority. We therefore hold that status as a citizen or taxpayer of a defendant municipality in Pennsylvania does not of itself disqualify a juror in a diversity action in federal court. In addition to this, actual bias or prejudice resulting from such status must be shown to sustain a challenge for cause.

In the instant case, during the selection of the jury, the plaintiffs were permitted extensive voir dire examination to inquire of all prospective jurors who were city residents whether this would prevent them from returning a fair and just verdict based on the evidence and law in this case. These questions were addressed to all citizens of the City of Erie who appeared upon the jury panel. All answered in the negative. Plaintiffs exercised only one peremptory challenge to strike a City of Erie resident.

Under 28 U.S.C. § 1861, it is provided:

"It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose."

In the Western District of Pennsylvania, the court sits at Erie and at Pittsburgh (28 U.S.C. § 118(c)). Cases arising in the counties of Crawford, Elk, Erie, Forest, McKean, Venango or Warren are docketed at Erie and juries for this "division" of the court are chosen from these counties. Thus, in a suit against the City of Erie, jurors come from throughout the area served by the court at Erie and there is something to be said for defendant's argument that it is entitled to a random selection of jurors chosen from throughout these seven counties. It is true that a large portion of the jurors do come from Erie County and from the City of Erie. To follow plaintiff's argument in this case, we would have to rule that in all suits against the City of Erie only those jurors who resided in other counties or in parts of Erie County outside the City of Erie were eligible to serve. The court ruled against plaintiff's position in this respect at the time of selection of the jury and we adhere to that ruling.

■ Further, plaintiffs claim that the jury was prejudiced and biased against them as the result of comments about the case in the news media. The court had directed the parties and their officers and employees to refrain from commenting on the case before and during the trial. In addition, the jury was instructed not to view, listen to or read anything which might be carried in the news media with respect to the case and was constantly admonished about this during the trial. (pp. 27–30 of proceedings)

The jury was selected on September 5, 1973, a Wednesday, and told to report for trial the following Monday, September 10. This gap between jury selection and commencement of trial was occasioned by absence of leading defense

counsel from the City which absence was excused by the court. Plaintiff claims that sometime during the interval, there was a telecast on one of the local television stations indicating that if the City lost the case, there might be a three mill tax increase.

The exact contents of this telecast have not been spread upon the record in this court and there was no request to question the jury about this during trial. The court was not requested to interrogate the jury as to whether or not the instructions had been violated and whether anything had been heard relative to this matter that would influence any of the jurors in their verdicts. The plaintiffs not having raised this question before or during trial are barred from raising it now as a grounds for new trial.

## II.   *Restriction of Expert Testimony With Respect To Building Codes and Regulations*

The plaintiff complains that his expert's testimony with respect to the condition of the Hoffman Building was unduly restricted in forbidding the expert to go into the ramifications of various building codes and standards. To understand this objection, we must recite some historical facts with respect to this case. Suit was started on March 2, 1971, by filing a complaint which was several times amended. The gravamen of the original complaint was that the City was negligent in supplying an insufficient supply of water to fight this fire, insufficient pipes and insufficient water pressure being alleged. The City promptly filed motions to dismiss which were denied by order of this court dated April 23, 1971 (Royal Indemnity Company v. City of Erie, 326 F.Supp. 571 (W. D.Pa.1971). It was there held that the City in the operation of its water bureau was engaged in a commercial or proprietary enterprise and hence was subject to liability under Pennsylvania law notwithstanding the general doctrine of governmental immunity as it then stood.

Following this order, there was considerable further skirmishing with respect to discovery matters and arguments with respect thereto and numerous extensions of time were granted. On May 10, 1973, pretrial was fixed for May 24, 1973. Plaintiff's pretrial narrative had not been filed until April 25, 1973 and defendant's pretrial narrative was filed on May 21, 1973. Following the pretrial conference on May 24, 1973, an order was entered placing the case on the trial list for the June term at Erie commencing May 29, 1973. It was specifically directed that the plaintiffs would be permitted to offer evidence with respect to their later claim that the City was also liable for not taking steps to demolish or secure the Hoffman Warehouse. This matter had not been pleaded in the complaint but was set forth in the pretrial narrative statement and defendant admitted it had known of this contention for some time.

At the pretrial conference held May 24, 1973, the court indicated that it had serious doubts that failure to take steps to remove the Hoffman Warehouse or make it secure was an act of negligence for which the City could be held liable in view of the governmental immunity doctrine in Pennsylvania.

By a strange coincidence on the previous day on May 23, 1973, the Supreme Court of Pennsylvania had handed down its decision in Ayala v. Philadelphia Board of Public Education, 453 Pa. 584, 305 A.2d 877 (1973) abolishing the doctrine of governmental immunity with respect to municipal corporations in Pennsylvania. This, of course, rendered the City liable for any negligence in connection with the Hoffman Warehouse and also, of course, for negligence in fighting the fire provided there was evidence of such negligence and it was the proximate cause of the destruction of the Schultz Building across the street.

Immediately upon the Ayala decision being called to the court's attention, the court directed that in the light of this development, trial of the case be contin-

ued and be placed upon the September trial list at Erie.

Following this, further depositions were taken and on August 22, 1973, the complaint was amended to set forth a cause of action with respect to the Hoffman Building. Leave was given to file the amended complaint provided that the trial should not be delayed. On August 27, 1973, a further pretrial conference was held and on August 28, 1973, plaintiff made another attempt to postpone the trial. On August 30, 1973, plaintiff's motion for continuance was denied. At the pretrial conference, plaintiff had attempted to submit a supplemental pretrial narrative statement with an expert's report attached thereto. This had been served on defendant August 24, 1973. In the order of August 30, 1973, leave was given to file a late expert's report as attached to the motion for continuance with reference to applicable codes and regulations deleted. The court ruled that it was too late to inject such matters into the case but in view of the fact that the City had known about the Hoffman Warehouse claim for many months, it was felt the City would not be prejudiced by injecting this matter into the case and an expert would be allowed to testify thereto, but not to go into details of building codes and regulations.

It was obvious that such matters were very detailed and technical and the court felt it would be unfair at the last moment to inject detailed matters with respect to all these standards as laid down by national organizations and codes, many of which are quite bulky, since the City would not have a chance to study this and have the counter expert's report prepared in time for trial which was then set to commence by drawing a jury on September 5, 1973. As noted in the transcript of the argument on August 30, 1973, plaintiff's counsel stated that what he wanted to refer to was the code known as the NFPA Code with standards for garages, it being claimed that the Hoffman Warehouse qualified as a garage and he claimed that the City of

Erie had a copy of it in its fire department office. No reference whatsoever was made to the BOCA Code, the City of Erie Building Code, in the argument.

Under Rule 5 pt. II(C)(2) of this court as applied to all civil actions under Rule 5 pt. II(D), provision is made for the filing of a pretrial narrative statement to have attached thereto copies of all reports including reports of experts upon which the plaintiff will rely at the time of trial. Plaintiff was delinquent in filing this report and only filed the same after delinquency notice was sent out by the Clerk. The purpose of the rule obviously is to give defendant ample opportunity to prepare his own experts and consider the matters which plaintiff's experts will testify to. It is provided in Rule 5 pt. II(G) that failure to disclose in the pretrial narrative statements or at the pretrial conference the substance of the evidence to be offered will result in exclusion of the evidence at trial "the only exceptions will be (1) matters which the Court determines were not discoverable at the time of the pretrial conference, (2) privileged matter, and (3) matter to be used solely for impeaching purposes". The late expert's report which plaintiff attempted to file covered matters which had been known to the plaintiff for many months and in the court's view no reasonable excuse was presented for not producing it prior to August 24, 1973, immediately before the trial date. Rule 5 pt. II(J) of this court provides that after a case has been pretried, no amendment to any pretrial statement or other pleadings shall be presented to the Clerk for filing unless authorized at the pretrial conference. "Otherwise, a party may amend only by leave of the court or by written consent of the adverse party; and leave shall be freely given when justice so requires."

We have been admonished by our Circuit to uphold the integrity of our pretrial procedures. See Shuber v. S. S. Kresge Co., 458 F.2d 1058 (3d Cir. 1972). On the other hand, where manifest justice requires it, in accordance with the Rule 16 of the Federal Rules of

Civil Procedure, we will allow amendments to pretrial narrative statements provided that the other side is not surprised or harmed thereby. It was the feeling of the court that to pick one or two sections out of bulky national building standards or codes and claim that there was some violation thereof to fasten negligence on the City a week before trial was manifestly unfair and, for this reason, we directed that reference to such codes and standards be deleted. If parties can rush in at the last minute, ten days before trial, with new experts' reports setting forth new grounds for fastening negligence upon the defendant, then our pretrial procedures are meaningless and we might just as well forget about them. There is no question these codes and standards are admissible if disclosed to the other side at the proper time.

The plaintiff now claims that it was prevented from relying upon the City's own ordinance known as the BOCA Code. Such is not the case. The provisions of the City of Erie Building Ordinance or BOCA Code were discussed often during the trial. At page 16 of the court's charge, reference was made to this ordinance which derives its initials from Building Officials Conference of America. It is a standard building ordinance which has been recommended for adoption by all municipalities and which the City of Erie had enacted with certain variations which are not material here. On pages 16 through 19 of the court's charge, the court discussed this ordinance in detail insofar as it was applicable to this case to enable the jury to answer Interrogatory No. 1 to determine whether the Hoffman Building was a fire hazard and unreasonably dangerous to the Schultz Building across the street. The jury was told to determine whether the City had used reasonable means in the light of what it knew and the notices given it to have this building either repaired or secured or demolished or whether it was negligent in not following through after a notice to the owner, Mrs. Hoffman, to do something about

the hazard. Numerous witnesses were examined and cross examined relative to the provisions of the BOCA Code and it was finally left to the jury whether, under the terms of the ordinance and what was known, this building constituted an unreasonable danger to the Schultz Building across the street. The jury answered "No" thereby finding that the City was not guilty of negligence with respect to this building and there was ample evidence in the record to support this finding by the jury.

The basis for plaintiff's contention that the City did not take proper steps with respect to the Hoffman Building was that it was used as a "public garage" for storage of "live" motor vehicles. The use of the term of "live" motor vehicles in this case derives from the fact that it was admitted that there were certain burned out hulks of motor vehicles located in this building from the time of a previous fire therein. These, of course, would not offer any fire hazard at all. There was also testimony offered by the plaintiff that there were certain so-called "live" vehicles, i. e., vehicles which were not burned out hulks, located in the building. Even assuming that there were "live" vehicles in the building which presumably would have gasoline in their tanks, the jury nevertheless found these had nothing to do with the spread of the fire from the Hoffman Building to the Schultz Building 55 feet across the street. This question as to any causal connection was specifically posed to the jury in Interrogatory No. 4 and the jury answered "No", finding that there was no causal connection between the presence of any "live" vehicles in the building and the spread of the fire to the Schultz Building. There was ample evidence to support the determination of the jury that even if there were "live" vehicles in the Hoffman Building, the fire nevertheless spread because of the placing of some highly incendiary material upon the second floor which caused the fire to erupt with tremendous speed and spread across the street as described by many witness-

es. There was testimony also that the rear door of the Hoffman Building had been broken open. Therefore, even if the court had permitted experts to testify that the building would be considered a public garage if there were "live" vehicles in it, this would add nothing to the picture since the jury determined there was no causal connection.

### III. Alleged Errors in the Court's Charge.

The plaintiffs further claim that the court made numerous errors in its charge with respect to the issue of the Hoffman Building being a public garage and with reference to various violations of the BOCA Code.

The BOCA Code as noted was extensively referred to throughout the trial, and certain portions were admitted in evidence. At pages 16 through 19 the court read various specific provisions from this ordinance bearing upon the case in conjunction with Interrogatory No. 1 as to whether the Hoffman Building was unreasonably dangerous to the Schultz Building which Interrogatory the jury answered "No".

The court then instructed the jury, if it determined the Hoffman Building was unreasonably dangerous, the next step was to determine whether the City was negligent in failing to take reasonable means to correct the hazards to secure the building and whether such failure was the proximate cause of the damage to the Schultz Building. In view of the fact that the jury had determined that the Hoffman Building was not unreasonably dangerous to the Schultz Building, and was not in an unreasonably dangerous condition as a fire hazard, the jury

never reached the question of the City's negligence in not taking steps to secure or demolish the Hoffman Building. The court had told the jury that many fire code violations could probably be found throughout the City but the City would not necessarily be negligent in not correcting all of them. The only question was whether the violations made the building unreasonably hazardous to surrounding structures and whether such hazards were the proximate cause of damage to the surrounding structures.

■ The plaintiff also contends that the Hoffman Building was a "public garage" under the BOCA Code as a matter of law and the court should have instructed the jury on this. There was continuing controversy throughout the trial as to what automobiles were in the Hoffman Building immediately prior to the fire. Certain evidence indicated that all there were in the building were burned out hulks from a prior fire which were no longer fire hazards. There was other testimony that there may have been cars there placed by a man named Sharkey who operated a business immediately adjacent to the Hoffman Building and who had a contract for towing cars from the City streets which might or might not have gasoline in their tanks and that he also may have placed several vehicles from his own business in this building, these last two categories being denominated "live" cars. The jury was clearly instructed that if the Building Inspector knew that the Hoffman Building was being used for the storage of live cars and this increased the hazardous condition of the Hoffman Building, then the Building Inspector had a duty to proceed against this improper use.[1] Thus, the

---

1. "Now, the fourth question, the so-called 'Sharkey Theory', brings up another matter which you must consider in connection with this case. There has been much testimony about autos in the Hoffman Building at or immediately before the time of the fire in July, 1970, and also at other times. We have had varying statements from witnesses as to the numbers of cars in there and what their conditions were, whether they were mere burned out hulks from the previous fire or whether they were cars placed there by Sharkey, ei-

ther in connection with his own business or which he had towed in under his contract with the City. You must first determine whether there were any cars in there beyond the burned out hulks left after the fire of September, 1969. And if you find there were any additional cars in there, I am referring to them for convenience purposes only as "live cars", although it is not clear that they had been towed in, being abandoned on the streets, whether they would have run anyway. If you find that there were live cars in there, other

issue as to whether as a fact the Hoffman Building was a public garage was presented to the jury and they answered Interrogatory No. 4 that the presence of any live automobiles as distinguished from burned out hulks was not a proximate cause of the spread of fire to the Schultz Building. There was ample support in the record for the jury's finding.

The plaintiff also complains about the refusal of certain requests for charge.

A. Plaintiff's Requests 11, 12 and 13.

The court had affirmed plaintiff's Request No. 10 with a modification which clearly told the jury that they could find that the Hoffman Warehouse was a storage garage for five or more automobiles making it a public garage under the Erie Building Code, if they found that the automobiles therein were live automobiles as distinguished from burned out hulks. The court then refused Request Nos. 11, 12 and 13 which bore on the same subject. At conference with counsel, prior to the court's charge, the court indicated that it refused No. 11 because it referred to a date of September 26, 1969, ten months before the fire, as to the use of the Hoffman Building for a public garage and the same was true of No. 12. No. 13 involved the use of this structure as a public garage without the installation of fire resistant materials. This last should be considered with plaintiff's Request No. 14 which was affirmed with a modification that if the Building Inspector knew the Hoffman Building was being put to use which increased its hazardous condition, then he had a duty to advise the tenant Sharkey of its improper use and to advise Mrs. Hoffman, the owner, as to the building's unsafe condition. This was affirmed.

In the light of all this, it is believed that the court had amply and fully covered the situation with respect to the Hoffman Warehouse as a public storage garage. In any event, the jury found that the storage of live automobiles in the building was not a proximate cause of the spread of the fire to the Schultz Building.

B. Request No. 17.

Plaintiff also complains of the refusal of Request No. 17. This was refused as having been covered by the general charge in part and partly being in conflict with it. In view of the fact that we left the question of proximate cause to the jury as to whether the Hoffman Building was the cause of the loss to the Schultz Building, this request was properly refused as being argumentative and, in any event, even if the Hoffman Building had been cleared of cars, dead or alive, it appears that the Schultz loss would nevertheless have still occurred.

C. Request Nos. 5, 6, 7 and 8.

Plaintiff also complains about the refusal of requests 5 through 8. No. 5 with respect to the mandatory duty of the Building Inspector to serve a notice that the Hoffman Building was unsafe was refused as repetitious, this matter already having been covered by Request No. 4 which had been affirmed with the modification that the evidence indicated the Building Inspector had complied with these requirements. No. 6 with respect to the duty of the City Solicitor to institute appropriate legal action, was affirmed with the modification that this was a correct statement of the law provided the City Solicitor, in the exercise of his discretion, considered this a proper case under the circumstances. Certainly, the City Solicitor has the discretion as to what suits he is going to in-

than the burned out hulks, then you would have to consider as to whether they were dangerous, whether the City should have known of their presence and taken steps to order Sharkey and Mrs. Hoffman to remove them, and if they were dangerous because of gasoline in their tanks, or otherwise, and whether, in fact, they did contribute to the spread of the fire from the Hoffman Building to the

Schultz Building. If the Building Inspector knew that this warehouse was being used for the storage of so-called live cars, and that this increased the hazardous condition, then he had a duty under the Building Code to advise Sharkey and Hoffman of this improper use and of the building's unsafe condition as a result. You may find, also, the City was negligent in this respect."

stitute in court which he has a reasonable chance of winning, just the same as the United States Attorney cannot be faulted for not bringing criminal prosecutions in every case. Request No. 7 was refused as not being a correct statement of the law. In any event, the jury having found the Hoffman Building was not unreasonably hazardous to the Schultz Building, this point made no difference. No. 8 was also refused since the same was argumentative and with respect to the failure of the Building Inspector's conduct constituting negligence amounted to a directed verdict for the plaintiffs to which they were obviously not entitled.

■ In sum total, it appears that plaintiffs' real complaint is that the jury found against them on a sharply disputed set of facts and where the facts were admitted, varying inferences could have been drawn. This the court cannot help since both parties were entitled to a jury trial, there was substantial evidence to support the jury's verdict, at least so substantial that the court is unwilling to find that the verdict is against the weight of the evidence. For these reasons, plaintiff's motion for new trial will be denied.