**Howard B. BREINER, Jr., and Doris Louise Breiner**

v.

**C & P HOME BUILDERS, INC., et al.**

**Civ. A. No. 71–2317.**

United States District Court, E. D. Pennsylvania.

July 16, 1975.

Edward N. Cahn, David Schattenstein, Allentown, Pa., for plaintiffs.

Edward H. Feege, Allentown, Pa., Richard W. Hopkins, Raymond T. Cullen, Jr., Philadelphia, Pa., for defendants.

## OPINION

BECHTLE, District Judge.

Plaintiffs commenced this diversity action against defendants to recover for damage to their farmland due to the inundation of surface water flowing from a neighboring higher tract of land that had been converted from farmland into a residential development. The case proceeded to trial and the jury, in response to special interrogatories submitted by the Court, found defendants negligent and awarded damages in the sum of $36,130.[1] Presently before the Court are remaining defendants' motions for a new trial and/or judgment notwithstanding the verdict.

Viewing the evidence in the light most favorable to plaintiffs, the following facts were developed at trial. Plaintiffs are the owners of a farm situated in Lower Macungie Township, Lehigh County, Pennsylvania, adjacent to a tract of real estate located in the Borough of Alburtis, Lehigh County, Pennsylvania, which was subdivided into single-family residential units by defendants Schnellman Construction Company and Meinrad Schnellman ("Schnellman"). On this adjacent tract of real estate, Schnellman, beginning in 1960, constructed approximately 38 homes without providing for adequate drainage systems for the increased flow of surface water. Instead, Schnellman built the houses, paved the streets, and graded the land in such a way as to substan-

---

[1]. The special interrogatory read as follows:
"1. Are defendants Meinrad Schnellman and Schnellman Construction Co. liable to plaintiffs?"
The jury answered, "Yes."
"2. Is the Borough of Alburtis liable to the plaintiffs?"
The jury answered, "Yes."
"3. Are defendants A. L. Wiesenberger Associates, Inc., and Jerome J. Polachek liable to plaintiffs?
The jury aswered, "Yes."
"4. In what sum should damages be awarded to the plaintiffs?"
The jury answered, "$36,130."
It should be noted that the question of liability of C & P Home Builders, Inc., was not submitted to the jury, as the Court granted its motion for directed verdict pursuant to Rule 50 of the Federal Rule of Civil Procedure at the close of plaintiffs' case. [N.T. 3–86, 87.]

tially increase the flow of surface water from the development onto plaintiffs' land, which was located downslope from the residential development. The increased flow of surface water flooded the lower portion of plaintiffs' property, thereby precluding plaintiffs from using their land to continue growing strawberries. Both plaintiff, Howard Breiner, Jr., and his father, Howard Breiner, Sr. (the current tenant of the Breiner tract), testified that, prior to the residential development, the surface water did not flow onto the Breiner tract but pooled in a swamp or marshy area on the upper farmland. This swampy retention area was filled in by Schnellman sometime in 1968, after which the flow of surface water runoff substantially increased.

As against defendant Borough of Alburtis ("Borough"), plaintiffs proceeded on the theory that the Borough was negligent in failing to enforce its land subdivision ordinance, specifically Article VI, section 4, concerning storm and surface drainage. (*See* plaintiffs' exhibit 36.) Plaintiffs showed that Schnellman submitted his subdivision plan (*see* plaintiffs' exhibit 34), which contained no provisions for a drainage system, and thereafter, the Borough approved the plan without requiring Schnellman to provide drainage facilities in compliance with the ordinance. This plan was approved by the Borough despite the fact that the Borough engineers alerted the Borough that Schnellman had failed to indicate on his drawings the means of storm drainage disposal. (*See* defendant Borough's exhibit 4.) Similarly, plaintiffs showed that defendants A. L. Wiesenberger Associates, Inc., the Borough engineer, as well as Jerome J. Polachek, the individual engineer assigned by Wiesenberger to provide engineering services to the Borough ("engineers"), were negligent in approving the subdivision plan, since it did not provide for drainage facilities. Plaintiffs offered an engineer, John S. Pidcock, as an expert witness, who testified that it was standard municipal engineering practice not to approve this type of subdivision plan unless the plan conformed to municipal rules and regulations. Furthermore, it was his experience that, if an engineer approved a plan, it meant that the engineer had reviewed the proposed method of storm water disposal and had satisfied himself that it met with the Borough's regulations. [N.T. 2–37–40.]

The defendants have advanced numerous arguments in somewhat of a "hit or miss" fashion in support of their motions for a new trial and/or judgment notwithstanding the verdict, only the following of which merit discussion:

I. *Alleged Error in the Court's Charge*

Schnellman contends that the Court erred in instructing the jury that they could conclude as a basis for liability that Schnellman's conduct was either intentional or negligent. Schnellman argues that there is no basis in Pennsylvania case law [2] for such a charge and, since there is no way of knowing how the jury categorized Schnellman's conduct, a new trial should be granted.

■ It is clear that under Pennsylvania law plaintiffs made out a valid cause of action. In *Westbury Realty Corp. v. Lancaster Shopping Center, Inc.*, 396 Pa. 383, 152 A.2d 669 (1959), the plaintiffs sought to enjoin developers of a shopping center from discharging surface water onto their land. The lower court sustained a demurrer to the complaint on the ground that it did not aver negligence or an artificial channeling of the water. The Supreme Court reversed, stating that the plaintiffs had stated a cause of action even though they could not show negligence. The Court noted that the construction of these large type developments prevent natural seepage and substantially increase the flow of surface water, and

2. This is a diversity action and, since all of the events complained of occurred in Pennsylvania, Pennsylvania law will be applied.

that the burden of the increased flow should not fall upon the neighboring landowners. As to the standard utilized in determining whether a legal injury has been suffered, the Court quoted with approval from *Lucas v. Ford,* 363 Pa. 153, 69 A.2d 114 (1949), wherein the Court stated:

> t is clear that only where the water is diverted from its natural channel or where it is *unreasonably or unnecessarily changed in quantity* or quality has the lower owner received a legal injury. *Id.* at 156, 69 A.2d at 116 (emphasis added).

 Therefore, it appears that a landowner may recover damages by merely showing that the upper landowner unreasonably increased the flow of surface water.

In *Taylor v. Harrison Construction Co.,* 178 Pa.Super. 544, 115 A.2d 757 (1955), the court did not find error in the trial court's charge which included a reference to both intentional and negligent conduct:

> Appellants cite section 833 of the Restatement of Torts governing the invasion of an interest in the private use of land by interference with the flow of surface waters. This section expressly refers, inter alia, to section 822 which sets forth that, if the actor is to be held liable, the invasion must be "either (1) *intentional* and unreasonable; or (2) unintentional and otherwise actionable under the rules governing liability for *negligent,* reckless or ultrahazardous *conduct.*" *Id.* at 548, 115 A.2d at 759 (emphasis added).

 Viewed in the total context of the Court's charge [N.T. 5—21–24] and in light of the above-mentioned cases, it cannot be said that the use of the word intentional constitutes reversible error. Even assuming, *arguendo,* that Pennsylvania law limits liability to only a negligent and unreasonable increase, Schnellman was benefited by the instruction as to intentional conduct as it presents a stricter burden of proof for the plaintiff. Schnellman would have liability limited to the question of whether he "should have known" that his subdivision would unreasonably increase the flow of surface water onto the plaintiffs' land. But the jury could have concluded not only that Schnellman should have known, but that he *actually did know* that there would be such an unreasonable increase. In fact, the evidence showed that Howard Breiner, Sr., alerted Schnellman as to the possibility of an increased flow, and Schnellman told him that he would take care of the drainage. [N.T. 3–24.]

## II. Defendants' (Borough and Engineers) Claim of No Duty Owed to Plaintiffs

### a.) The Borough's Duty

The Borough contends that it owed no duty to plaintiffs to regulate or control construction projects within the Borough in order to prevent increases in the flow of surface water onto plaintiffs' land, thereby requiring this Court to grant a judgment notwithstanding the verdict. Plaintiffs contend that it was negligent for the Borough to approve Schnellman's subdivision plan when they had notice that the subdivision would unreasonably increase the surface water drainage to plaintiffs' detriment. As mentioned above, plaintiffs' property is located in Lower Macungie Township, separated by a road from the Schnellman property located in the Borough of Alburtis. The precise issue presented then is whether or not a municipality (Borough) owes a duty to a landowner (Breiner), whose land is not within the Borough, to enforce a Borough ordinance and land subdivision regulations?

Before addressing this issue, it must first be determined whether Schnellman's subdivision plan was subject to and governed by the provisions of the land subdivision ordinance. Schnellman bought the property in 1958 and, in September of 1959, he submitted the original subdivision plans for the Borough's

approval. Sometime between September of 1959 and the end of the year, the plans were returned to Schnellman for reasons that are not contained in the record. Subsequent to the return of the original plans, on February 1, 1960, the Borough approved and adopted the land subdivision ordinance. Schnellman then resubmitted the plans on February 20, 1960, and then again in a revised form on March 7, 1960. [N.T. 3–128.] The Borough did not act on the plans until March 6, 1967, when they were finally approved. Although the Borough did not approve the subdivision plans for some seven years after resubmission, Schnellman continued to build throughout this entire period.

 The law of Pennsylvania is now clear that a local government cannot effectively adopt or modify a subdivision ordinance that will control, prohibit, or alter subdivision plans submitted prior to the enactment of, or amendment to, an ordinance. *See* Article V of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, 53 P.S. § 10101 *et seq.* (MPC),[3] and *Monumental Properties Inc. v. Board of Commissioners,* 11 Pa.Cmwlth. 105, 311 A.2d 725 (1973). However, when the Borough enacted the ordinance in 1960, it was pursuant to the act of July 19, 1951, P.L. 1026, §§ 1671–1678. This statute, unlike the MPC, was silent on this point. Also, in *County Builders, Inc. v. Lower Providence Township,* 5 Pa.Cmwlth. 1, 7, 287 A.2d 849, 852 (1972), the court held that, even under the MPC, no rights of a subdivider

would be violated if, after submission, the ordinance was altered where demanded by the particular circumstances.[4] Finally, in this case, there was a *resubmission* of the plan after the local ordinance was approved by the Borough. Therefore, Schnellman is bound by the terms of the subdivision ordinance which was approved and adopted prior to his resubmission of the plans, particularly in light of the fact that no bad faith on the part of the Borough was shown in connection with the return of the original plans.

Having decided that the land subdivision ordinance was applicable to Schnellman's residential development, the issue is whether or not the Borough violated a duty by its failure to enforce the ordinance and regulations contained therein. Although both parties have cited. numerous Pennsylvania cases in support of their positions, neither has cited, nor has this Court's research revealed, any case that is directly on point. The Borough cites *Kunkle v. Borough of Ford City,* 316 Pa. 571, 175 A. 412 (1934); *Strauss v. Allentown,* 215 Pa. 96, 63 A. 1073 (1906); and *Fritch v. Borough of Northhampton,* 77 Pa.Super. 385 (1921). These cases hold that municipalities which participate in the actual construction will not be liable for the increased flow of surface water resulting from normal expansion and development, but will be liable if the surface water is negligently diverted from its natural channel.[5] Similarly, in *Jacobs v. Nether Providence Township,* 58 D&C 565 (Delaware Co. 1972), the court

---

3. Specifically, Section 508(4) provides in pertinent part:

From the time an application for approval of a plat, whether preliminary or final, is duly filed as provided in the subdivision and land development ordinance, and while such application is pending approval or disapproval, no change or amendment of the zoning, subdivision or other governing ordinance or plan shall affect the decision on such application adversely to the applicant and the applicant shall be entitled to a decision in accordance with the provisions of the governing ordinances

or plans as they stood at the time the application was duly filed.

4. *See* Borough's subdivision regulations, Article IX, section 2, plaintiffs' exhibit 36, which gives the Borough the power to alter, change, or modify as may be necessary in the public interest.

5. These holdings have been modified by *Westbury Realty Corp. v. Lancaster Shopping Center, Inc.,* and *Lucas v. Ford, supra,* in that liability may now be imposed for unreasonable increases in surface water runoff, as well as for artificial diversion.

overruled a demurrer where the township designed and approved a drainage system which resulted in damage to plaintiffs' property. It is clear that the thrust of the opinion focused on the township's having designed the faulty drainage system.

The cases involving a failure to enforce an ordinance, rather than participation in the actual construction, cast some light on the issue but fail to illuminate it. In *Wecksler v. Philadelphia,* 178 Pa.Super. 496, 115 A.2d 898 (1955), the plaintiffs contended that the city was liable for injuries sustained from a fall off the curb of a sidewalk. At trial, the city was held liable on the ground that it failed to enforce its ordinance concerning parking regulations. The city was granted a judgment notwithstanding the verdict as the appellate court found that the city was acting under a discretionary or governmental power and, as such, could not be liable for failing to enforce an ordinance enacted pursuant to permissive authority.[6] In *Morse v. Radnor Township,* 50 Del. 145 (C.P.Pa.1962), the township's only connection with the litigation was that it approved the construction plans of a developer. The court found that, even though the subsequent construction was negligently carried out, the plans were drawn by competent engineers in accordance with good engineering practice, which plans resulted in only a reasonable increase in surface water runoff. Thus, the court did not hold that the municipality could never be liable for mere approval, but only that there could be no liability if the plans were properly drawn. In this case, Schnellman's plan was not properly drawn, as it failed to provide for adequate drainage facilities, a fact brought to the Borough's attention by their own engineers. Similarly, in *Royal Indemnity Company v. City of Erie,* 372 F.Supp. 1137 (W.D.Pa.1974), the plaintiff insurance company sued the city for its negligent failure to enforce the building and fire codes, thus allowing an adjacent building to remain in a hazardous condition. Unlike in *Morse,* the court permitted the jury to conclude that the city would be liable for negligence in its failure to enforce the city's building and fire codes. In response to special interrogatories, the jury held that the adjacent building was not in an unreasonably dangerous condition constituting a fire hazard, thus never reaching the question of the city's negligence in not taking steps to prevent the hazardous condition. Since the jury found all defendants liable in this case, they must have concluded, unlike the jury in *Royal Indemnity,* that there was an unreasonable increase in the surface water runoff, and that the Borough, through its negligence in failing to enforce the ordinance, proximately caused the increase.

Until the Supreme Court of Pennsylvania handed down its decision in *Ayala v. Philadelphia Board of Education,* 453 Pa. 584, 305 A.2d 877 (1973), abolishing the doctrine of governmental immunity with respect to municipal corporations, the Borough may have had a tenable argument as to its lack of duty. The judge in *Royal Indemnity Company v. City of Erie, supra* at 1141, indicated that prior to *Ayala* (which was handed down before *Royal Indemnity* proceeded to trial) he had serious doubts that the city could be held liable for negligently failing to enforce its building and fire codes. He noted, however, that the holding of *Ayala* rendered the city liable for any negligence in connection with the

---

6. To the extent that the court in *Wecksler* cloaked the city with governmental immunity because it acted in a discretionary rather than a proprietary capacity, that holding has been overruled by the Pennsylvania Supreme Court in *Ayala v. Philadelphia Board of Education,* 453 Pa. 584, 305 A.2d 877 (1973). For a more complete discussion of that decision, *see* citation of *Ayala, infra.* The distinction between a governmental as opposed to a proprietary act is essentially that if a municipality engages in an activity that private business would normally engage in, then it is proprietary. Any acts not fitting such a description will probably be deemed discretionary or governmental acts.

hazardous adjacent property, provided that such negligence and proximate causation could be proved.

Implicit in *Ayala* are some of the policy reasons as to why municipalities should be held accountable for their negligent discretionary acts, as well as negligent proprietary acts. One reason is that, as between the municipality and the injured individual, the former should bear the losses due to its tortious conduct. Thus, "[i]mposition of tort liability will . . . be more responsive to current concepts of justice. Claims will be treated as a cost of administration and losses will be spread among all those benefited by governmental action." 453 Pa. at 599, 305 A.2d at 884 (citations omitted). Another ameliorating factor is the availability of public insurance to protect the public treasury against possible damage claims. Finally, and perhaps most important of all, is the sobering effect such an imposed duty will have on municipalities and their officers. "[W]here governmental immunity has had the effect of encouraging laxness and a disregard of potential harm, exposure of the government to liability for its torts will have the effect of increasing governmental care and concern for the welfare of those who might be injured by its actions." *Id. citing* Note, The Discretionary Exception and Municipal Tort Liability: A Reappraisal, 52 Minn.L.Rev. 1047, 1057 (1968). Indeed, such a duty does not impose a heavy burden on municipalities and their officers, but merely clarifies a function that most already carry out. This Court is not requiring the Borough to order the construction of, nor itself construct, a drainage system for each subdivision, but rather is saying that the Borough

should withhold approval of a subdivision plan until such time as it complies with all the provisions of its land subdivision ordinance, a duty easily complied with.[7]

Coupled with the above-stated policy reasons is the fact that, in promulgating its land subdivision ordinance, the Borough set forth the standards by which it was to act and the persons it sought to protect. As is traditional with most ordinances involving land use regulations, the preamble to this ordinance speaks in terms of providing "for adequate open spaces for traffic, recreation, light and air . . ., thereby creating conditions favorable to the health, safety, morals and general welfare of its citizens . . . ." Immediately following the preamble, the ordinance specifically sets out the requirements that must be met before any subdivision may be approved:

No subdivision of any lot, tract, or parcel of land shall be effected, no street, sanitary sewer, storm sewer, water main, or other facilities in connection therewith shall be . . . constructed . . ., *except in strict accordance with the provisions of these regulations.* (Emphasis added.)

Finally, contained in these regulations is Article VI, section 4—Storm and Surface Drainage. It states:

All storm drains and drainage facilities such as gutters, inlets, bridges, storm sewers and culverts as may be required by the Borough, shall be installed by the developer and the land graded for adequate drainage. *Street grades shall be such that no surface drainage is discharged over lots; where topographic conditions require that drainage ways other than streets*

7. Apparently, the Borough's denial of approval until full compliance will prevent a developer from beginning construction of a development. In fact, the subdivision regulations provide that before the council will approve a final plan, they shall require the necessary grading, paving and other street improvements, including storm sewers, or that the Borough be insured, in the form of a bond or the deposit of funds in escrow, that the improvements will subsequently be installed by the owner. Thus, the Borough has within its power, the capacity to prevent tortious conduct and resulting damages, such as the damage to the Breiner tract. (*See* plaintiffs' exhibit 36, Art. II and Art. IV, sec. 2(B).)

*or alleys must be employed, prepared easements shall be provided over them.*

All details of drainage systems shall be shown on the Final Plan, or by means of an accompanying Drainage Plan. (Emphasis added.)[8]

It is obvious that the Borough made provision for the protection of those lots over which surface drainage would run, through the requirement of procurement of prepared easements over those lots. These easements cannot be procured unless the details of the drainage system are shown on either the preliminary or final plan, which the Schnellman plan failed to provide.

■ Therefore, for the above-stated reasons, this Court finds that the defendant Borough owed a duty to the plaintiffs to enforce its land subdivision ordinance, and, as the jury found, the negligent failure to enforce it (in conjunction with Schnellman's and engineers' negligence) proximately caused the damage to plaintiffs' property.

b.) *The Engineers' Duty*

The engineers also ask this Court to grant a judgment notwithstanding the verdict on the ground that they owed no duty to order construction of a drainage system. In support of their position, the engineers cite Section 324A of the Restatement of Torts, Second, which provides:

Liability to Third Person for Negligent Performance of Undertaking.

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or third person upon the undertaking.

Citing *DeJesus v. Liberty Mutual Insurance Co.*, 423 Pa. 198, 223 A.2d 849 (1966), the engineers argue that section 324A requires proof of both a failure to exercise reasonable care which increases the risk of harm, *and* reliance by the plaintiff. *DeJesus* involved the interpretation of Section 323 of the Restatement of Torts, Second,[9] which is similar to section 324A, except that it pertains to a plaintiff in a direct relationship with the one rendering services, rather than one in a third party beneficiary position. The *DeJesus* court interpreted section 323 as requiring both an increase in risk and reliance noting that the import of that section necessitated such a dual finding. This holding would seem a logical outgrowth of section 323 as, assuming a direct relationship, reliance will be present in almost every case.[10] However, the Third Circuit in *Evans v. Liberty Mutual Insurance Com-*

---

8. The details of the proposed drainage systems must also be shown on the preliminary plan (Art. VII(9)), specifically indicating "where the water will be drained *and how it will effect adjacent properties.*" (Emphasis added.)

9. Section 323 provides:
Negligent Performance of Undertaking to Render Services.
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.

10. *See* Restatement (Second) of Torts § 324A, Illustration 1, for an example of a negligent service performed and non-reliance by the affected third party.

*pany*, 398 F.2d 665 (3d Cir. 1968), held that, while section 323, as interpreted in *DeJesus*, required a finding of both an increase in risk and reliance, under section 324A, a finding as to either one would be sufficient:

> In the instant case, as the District Court correctly found, plaintiff failed to adduce evidence that Liberty's "nonperformance", viz., failure to inspect his machine, increased his "risk of harm" *or* that plaintiff relied on an inspection. 398 F.2d at 667 (original emphasis).

■ Thus, the question is whether or not there was enough evidence to satisfy one of the subsections of section 324A. It is clear that by their letter of September 6, 1966 (*see* defendant Borough's exhibit 4), warning the Borough that Schnellman failed to indicate means of storm water disposal on his drawings, the engineers "recognized" that the lack of such means would have a deleterious effect on the tracts of land lower than Schnellman's. In the light of such knowledge, the engineers nevertheless signed the plan on March 6, 1967, without requiring Schnellman to indicate how he was going to dispose of the increased surface water runoff. Since a withholding of approval could have effectively prohibited Schnellman from beginning or continuing the construction of his development, the engineers increased the risk of harm to plaintiffs' property. [*See* N.T. 2–41, 42.][11]

### III. *Borough's Claim of Res Judicata*

The Borough contends that it is entitled to a judgment notwithstanding the verdict because plaintiffs' claims against the Borough was *res judicata* by reason of the prior judgment of a competent court of the Commonwealth of Pennsylvania. *Breiner v. C & P Home Builders, Inc.*, (C.P.Lehigh Co. 1973). The Borough contends that the complaint in the instant action is virtually identical to the complaint in the state court action, as it challenges the same acts by the Borough and advocates an identical theory of liability; *i. e.*, that the Borough was negligent in approving Schnellman's subdivision plan because it did not comply with the subdivision regulations. In its sustaining of the Borough's demurrer, the Borough argues that the state court held that it owed *no* duty to plaintiffs and, therefore, could not have breached any duty to the plaintiffs. Even though the state court action was dismissed with leave to amend, any new complaint against the Borough would have to have stated a cause of action different from the one in the original complaint, as the original complaint succumbed to the attack of a demurrer.

Assuming, *arguendo*, that the state court's decision would subject the complaint in the instant case to the defense of *res judicata*, this Court finds that Judge Backenstoe, in his opinion, did not hold that the Borough owed *no* duty to plaintiffs. On the contrary, since the court was unable to find any controlling precedent, it felt constrained to approach the issue by applying the elements of the law of negligence. Specifically, as to a duty owed by the Borough to plaintiffs, the court stated:

> With respect to the granting of building permits and approving a subdivision plan, the plaintiffs argue that the borough has a statutory duty to the

---

11. The engineers also contend that the Court erred in instructing the jury that they could use the information contained in the Borough's subdivision ordinance, in determining whether the engineers acted in a prudent manner. [N.T. 5–30, 31.] In support of their argument, they cite Section 288(b) of the Restatement of Torts, Second, which essentially provides that a legislative enactment cannot be adopted as the standard of conduct of a reasonable man if the enactment's purpose is exclusively to secure enjoyment of rights or privileges to individuals simply as members of the general public. Suffice it to say that our discussion of the purposes of the Borough's ordinance, *supra*, precludes a finding that the ordinance's purpose was exclusively to secure rights or privileges to individuals only as members of the general public.

plaintiffs without citing the pertinent ordinance. In the Act of July 31, 1968, P.L. 805, et seq. (53 P.S. § 10502, et seq.), the Legislature set forth the procedures and manner in which a borough or other municipality may enact subdivision and land development ordinances. Section 503 of the Act provides what the ordinance may include. We assume that the Borough of Alburtis did enact a subdivision ordinance in accordance with the statute.[12] *However, this ordinance has not been pled nor has counsel provided us with a copy. Thus, we have no knowledge as to whether this ordinance imposes a duty upon the township to take into account the effect of water drainage on adjacent properties.* (Emphasis added.)

█ It is clear from its opinion that the state court did not hold that the Borough owed no duty to the plaintiffs, but reserved decision on the issue depending on how it might, in the future, construe the Borough's subdivision ordinance. Since this Court has had the benefit of examining the ordinance and has held that a duty does exist (*see* discussion at section II(a), *supra*), the Borough is not entitled to a judgment notwithstanding the verdict *via* the defense of *res judicata.*

IV. *Verdict was Excessive and Contrary to Court's Instructions*

█ Defendants, Borough and engineers, ask for a new trial on the grounds

that the verdict ($36,130) was excessive and contrary to the Court's instructions. The jury was instructed that they should award "the lesser of either the reasonable cost to cure the condition or the amount by which the plaintiffs' property depreciated in value from the date before any increased flow, if any, occurred, and the time that it occurred." [N.T. 5-41.] As to depreciation in value, Howard Breiner, Sr., testified on direct examination that the six or seven acres affected by the increased surface water runoff were previously worth $7,000 per acre and that following the inundation they were worth $50 per acre. [N.T. 3-49, 50.] [13] As to the cost to cure, the plaintiffs' evidence indicated that such a cost was approximately $43,000 plus the cost of the right-of-way across plaintiffs' property. [N.T. 2-35.] [14] The right-of-way was to be approximately 1,150 linear feet (across the Breiner tract), costing between $1.50 and $2.00 per linear foot. [N.T. 2-37.] It was then determined that the sum total would have to be reduced by some twenty percent (20%), to reflect the cost as of the date the problem began. The jury could have taken 20% of the $43,000 plus the cost of the easement ($1.75 X 1,150 linear feet), the sum total of which would have been more than they actually awarded ($36,130). Therefore, there was sufficient evidence to support the verdict, and the jury followed this Court's instructions and awarded the lesser of the two figures presented to them; the cost to cure.

12. The land subdivision ordinance was adopted and approved in February of 1960, and was enacted in accordance with the Act of July 19, 1951, P.L. 1026, §§ 1671-1678.

13. Defendants quite rightly point out that on cross-examination Mr. Breiner testified that he was offered, but turned down, approximately one and one-quarter million dollars for the purchase of the entire farm. [N.T. 3-56.] Also, Mr. Rodney A. Grammes, defendants' expert real estate witness, testified that the Breiner tract was worth approximately $1,500 per acre in 1971. [N.T. 4-61.] From this, the defendants conclude that the jury should have awarded only nominal damages. Such a conclusion is erroneous in that there was no evidence offered

by the defendants that the million dollar plus offer in any way took into account the surface water runoff problem. Thus, the offer could have been much higher without such a problem. Likewise, Mr. Grammes testified on cross-examination that, in arriving at his appraisal value of the Breiner tract, he did not take into consideration the surface water runoff problem. [N.T. 4-69.] Therefore, considering all the evidence, the jury could have concluded that the depreciation in value was greater than the cost to cure, thereby disregarding the depreciation figure as per this Court's instructions.

14. This Court twice instructed the jury that it was to add the cost of the right-of-way to the cost to cure. [N.T. 5-41.]

For all of the foregoing reasons, the defendants' motions for a new trial and/or judgment notwithstanding the verdict will be denied.