## Herring v. Philadelphia

*Joseph Busacco*, for plaintiff.
*John J. Snyder*, for City of Philadelphia.
*John H. Potts*, for defendant.

McDEVITT, *J.*, April 10, 1979—This case was heard before the Honorable John J. McDevitt, 3rd, and a jury from September 13 to 15, 1978. At the conclusion of trial, the jury entered a verdict of $20,000 in favor of plaintiff, Johnnie Herring, against the City of Philadelphia and St. John's United Methodist Church, and a verdict of $2,857.15 in favor of his mother, Cynthia Herring, against the same defendants.

## I. FACTS

The action arises out of injuries sustained by minor plaintiff on May 3, 1969, when a limb from a dead tree fell on him while he was playing on a vacant lot at 858 North Lawrence Street, Philadelphia. At the time of the accident, plaintiff was four years old. The lot where the mishap occurred was privately owned by St. John's United Methodist Church, which had been left the property under a decedent's will.

Evidence was adduced at trial that the tree in question had shown no sign of life for at least two or three years prior to the occurrence. Neighborhood children used the vacant lot as a playground, and a rope attached to one of the tree limbs served as a swing. Boys were seen swinging on the rope 15 minutes before the accident occurred. Various witnesses, including a representative of the local improvement committee, testified that they had com-

plained to officials at the department of licenses and inspections about the hazard posed by the dead tree. In response to these calls, two officers for that department, a Mr. McCoy and a Mr. Morse, met with the community representatives. After inspecting the premises in question, they advised the improvement committee chairman, Fannie Polo, to contact the land utilization division of licenses and inspections. She did this, and a Mr. Lath from that office responded. At that point, Miss Polo testified:

"Q: Okay. And what took place at that meeting?
A: Okay. We showed him the tree.
The Court: How long after you talked to him?
The Witness: I think it was like three days later.
The Court: We're talking about what year or what month of what year?
The Witness: It was early in '68.
The Court: All right.
The Witness: He came out and we showed him the tree, and he told us it would take a long time if he had to go through the Fairmount Park Commission to get the tree cut down because any trees had to be removed had to go through the Fairmount Park Commission.

So, he told us we'd do better if he bought us an electric saw and we cut it down ourselves.

A week later, he didn't show up. I called and he told us he was working on it.

The same thing, a couple of days later, we still didn't hear from him. Same reply, he was working on it, it took time.

After that, we just kind of forgot about it until the tree fell on the boy."

Medical testimony was produced that plaintiff sustained severe head injuries and has permanent facial scarring as a result of the accident.

## II. DISCUSSION

In bringing suit against the city, plaintiff basically relied on two theories: (1) that the city negligently permitted a dangerous and hazardous condition to continue, despite notice of its existence; and (2) the city negligently failed to provide for removal of the hazard after its agent promised to do so, which promise was relied on by the affected community.

With respect to both theories, the city argues that it is absolved from liability on the basis of Ricketts v. Allegheny County and City of Pittsburgh, 409 Pa. 300, 186 A. 2d 249 (1962). In that case, minor plaintiff was injured when she fell through the roof of a house that had been vacated by order of the county health department four months before the accident. The health department had cited the unsafe and dilapidated state of the structure as the basis for its order. The privately owned house was located across from a public playground, and after the tenants vacated, the building became an attraction for children from the heavily populated neighborhood.

In Ricketts, as here, plaintiff alleged that the municipal defendants were negligent because they failed to take measures to abate the hazardous nuisance of which they had knowledge. The Supreme Court rejected that theory; however, in doing so, it cited reasons that are extraneous to the facts sub judice. With respect to the City of Pittsburgh the Ricketts court held that the county health department was not an agent of the city and therefore the city could not be held liable for any action by officials of that department. As for the county, the court ruled that it was a subdivision of

the Commonwealth and thus shielded from liability by the doctrine of sovereign immunity.[1]

Despite the narrow holdings in the case, Ricketts is still instructive for present purposes in its discussion of the responsibility of a municipality for a nuisance on private property. The court stated:

"The appellants argue that a municipality is liable in tort for permitting a nuisance to be maintained in its jurisdiction and under its direct control, and further contend that a legal title is not necessary to hold a municipality liable for permitting the nuisance, merely the right to possession and direct control over the property. The appellants rely on Cooper v. Reading, 392 Pa. 452, 140 A. 2d 792 (1958); Pintek v. Allegheny County, 186 Pa. Superior Ct. 366, 142 A. 2d 296 (1958). In reviewing the Reading case, we find an entirely unrelated situation because in that case the city, pursuant to an easement, discharged its storm drainage water into the bed of a former canal which formed a pool where two boys drowned. In this case the city had control of the land. In the Pintek case the County of Allegheny bought the property involved with two other taxing bodies at a tax sale and rented the property out to tenants.

"In the present case, neither of the defendants acquired title, possession, or maintained, contributed to or in any way were responsible for the conditions which existed on the private premises where the trespassing plaintiff was injured. . . .

1. The doctrine of sovereign immunity was subsequently abolished in this jurisdiction by the Supreme Court's decision in Mayle v. Pennsylvania Department of Highways, 479 Pa. 384, 388 A. 2d 709 (1978).

"The Allegheny County Department of Health was under no obligation to find that the structure constituted a public nuisance, especially when it is extremely doubtful if such a finding could have been justified. The only danger the house created was one to immediate trespassers and to no one off the premises." 409 Pa. 300, 304-5, 306.

Thus, aside from its actual holding, the court seemed to be saying that a city has no duty to abate a nuisance on private property, when the city is not in possession of the land and there is no danger to persons off the premises. Plaintiff herein, as in Ricketts, was technically a trespasser. While that fact does not relieve the property owner of certain duties, the city would not have responsibility in that situation under the Ricketts rationale. We believe that rationale is still applicable today, and therefore hold that the city herein could not be held liable merely because its agents were aware of the nuisance and took no action to correct the same.[2]

However, there remains plaintiff's second theory, that the city should be held liable by virtue of its agent's promise to provide a saw for cutting

2. While the discussion in Ricketts rejecting liability for nuisance was not premised on governmental immunity, it is important to note that the subsequent abolition of the latter doctrine greatly enlarged the ambit of municipality tort liability: Ayala v. Philadelphia Board of Education, 453 Pa. 584, 305 A. 2d 877 (1973). As a consequence, authority now exists that a city may be held liable for failing to enforce an ordinance where such non-enforcement is the proximate cause of injury. See, e.g., Royal Indemnity Company v. City of Erie, 372 F. Supp. 1137 (W.D.Pa. 1974); Breiner v. C & P Home Builders, 398 F. Supp. 250 (E.D.Pa. 1975). In the present case, no proof was presented of any applicable ordinances.

down the tree. Specifically, plaintiff invokes section 323, Restatement, 2d, Torts, which provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."

This provision has been adopted by our Pennsylvania appellate courts, and has been interpreted to require two prerequisites for recovery:

"The import of that section is that negligent performance or nonperformance must increase the risk of harm, and that there must be reliance by the injured plaintiff upon the defendant's performing the service he has undertaken to render." DeJesus v. Liberty Mutual Ins. Co., 423 Pa. 198, 201, 223 A. 2d 849 (1966); see also, Hamil v. Bashline, 243 Pa. Superior Ct. 227, 364 A. 2d 1366 (1976).

It should be noted that an official "caveat" to section 323 states:

"The Institute expresses no opinion as to whether . . . the making of a contract, or a gratuitous promise, without in any way entering upon performance, is a sufficient undertaking to result in liability under the rule stated in this Section."

This statement describes the instant situation where defendant's agent did no more than make a

promise that was not coupled with any action. The official comment on this "caveat" argues:

"There is no essential reason why the breach of a promise which has induced reliance and so caused harm should not be actionable in tort. This is true particularly where the harm is physical harm, to the person, land, or chattels of the plaintiff. The technicalities to which the courts have resorted in finding some commencement of performance indicate a development of the law toward such liability."

When section 323 is applied in a governmental setting, there would seem to be a valid question as to whether public policy is served by positing liability on the mere promise of an official. However, we have found no authority for distinguishing the governmental situation from any other.

Other jurisdictions have applied section 323 to cases of government action. A spectacular example is Brown v. McPherson's, Inc., 86 Wash. 2d 293, 545 P. 2d 13, where it was held that a cause of action was established against the state for loss of life and property that resulted from an avalanche. Plaintiffs claimed that a state employe was informed by an avalanche expert that the area was in danger, but the employe took no action even though he led the expert to believe the state would deal with the matter. In partial contrast, see Roberson v. United States, 382 F. 2d 714 (9th Cir. 1967), where an injured workman on a Federal project attempted to sue the Federal government because it had sent inspectors to check on safety conditions at the work site. In refusing to impose liability under section 323, the court held that the government's

safety inspection did not represent the undertaking of services for another.

The city places great emphasis on Ricketts, supra, in arguing against the present application of section 323. However, Ricketts did not deal with that theory, for it was handed down before section 323 was first applied in this Commonwealth. Moreover, the facts in Ricketts are distinguishable on the issue of reliance. After the vacated house therein became a playground for children, there is no evidence of any governmental action, or promise thereof, on which neighbors relied.

In the present case, the city chose not to present any testimony. Consequently, there was no contradiction of Miss Polo's statement that a Mr. Lath from the Land Utilization Office visited the site and promised to provide the improvement committee with an electric saw to cut down the tree. The city was able to argue that no reliance occurred since the promise was made over a year before the accident, after which Miss Polo said, "We just kind of forgot about it. . . ." However, that issue was properly left for the jury to resolve.

In considering the motion for judgment n.o.v. which the city presses upon us, we are mindful that the evidence and all reasonable inferences arising therefrom must be viewed in a light most favorable to the verdict winner: Fallon v. Penn Central Transportation Co., 444 Pa. 148, 279 A. 2d 164 (1971); Isaac v. Continental Gas Co., 442 Pa. 480, 276 A. 2d 299 (1971); Wisniewski v. Great A. & P. Tea Co., 226 Pa. Superior Ct. 574, 323 A. 2d 744 (1974). As stated in Eldridge v. Melcher, 226 Pa. Superior Ct. 381, 385-86, 313 A. 2d 750 (1973):

"A judgment n.o.v. is the directing of a verdict in

favor of the losing party, despite a verdict to the contrary. It may only be entered in a clear case where the evidence is insufficient to sustain a verdict against him. Stewart v. Chernicky, 439 Pa. 43, 266 A. 2d 259 (1970). Judgment n.o.v. is inappropriate if the evidence on a material point presented as issue of fact for decision by the jury. This method of attacking the verdict may never be utilized so as to invade the province of the jury, especially where that determination is based partly on questions of conflicting testimony and credibility of witnesses. Brandon v. Peoples Natural Gas Co., 417 Pa. 128, 207 A. 2d 843 (1965); Axilbund v. McAllister, 407 Pa. 46, 180 A. 2d 244 (1962). Where such questions were determined by the trier of fact, and if there is reasonable support for the verdict which was rendered, a judgment n.o.v. will not be granted. . . ."

See also, Atkins v. Urban Redevelopment Authority, _____ Pa. Superior Ct. _____, 396 A. 2d 1364 (1979). Also, with respect to the motion for a new trial, we are bound by the rule that:

"A new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion [citation omitted]. Neither should it ordinarily be granted on the ground that the verdict was against the weight of the evidence where the evidence is conflicting and the jury might have found for either party? [citation omitted.] A new trial should be awarded on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." Burrell v. Philadelphia Electric Co., 438 Pa. 286, 289,

265 A. 2d 516 (1970); Albert v. Alter, 252 Pa. Superior Ct. 203, 381 A. 2d 459 (1977).

From the construction we must give to the evidence, it is obvious this is a narrow situation, involving an unconditional promise to do a specific act by the appropriate officer, who had authority to promise and who was acting in his official capacity, thereby producing justified reliance. The city did not present testimony to challenge any of these points. Given that fact, we believe plaintiff passes muster under the applicable standards for post-trial motions. Defendant's motions for a judgment n.o.v. or for a new trial are therefore denied.

## ORDER

And now, April 10, 1979, upon consideration of the motion for judgment n.o.v. or for new trial filed by defendant, City of Philadelphia, it is hereby ordered that said motion be denied.